**UNITED STATES of America, Plaintiff-Appellee.**

v.

**Paul Clyde VILLANO and Pauline Smaldone, Defendants-Appellants.**

Nos. 74–1463, 74–1464.

United States Court of Appeals, Tenth Circuit.

Argued March 24, 1975.

Decided Jan. 8, 1976.

Rehearing and Rehearing In Banc Denied Feb. 17, 1976.

---

5. Circuit Rule 23 shall not be applied.

W. Allen Spurgeon, Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., and John W. Madden, III, Sp. Asst. U. S. Atty., Denver, Colo., on the brief), for plaintiff-appellee.

Irl B. Baris of Newmark & Baris, St. Louis, Mo. (Joseph Saint-Veltri of Davies & Saint-Veltri, Denver, Colo., on the brief), for defendants-appellants.

Before SETH, HOLLOWAY and BAR-RETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendants Paul Clyde Villano and Pauline Smaldone were convicted on jury verdicts under a three-count indictment, each count covering one of three time periods, for using, causing to be used, or aiding and abetting the use of a communication facility in interstate commerce, namely the interstate telephone, in violation of 18 U.S.C.A. §§ 1952 and 2. On appeal defendants raise questions concerning the sufficiency of the evidence, jury instructions, telephone voice identification, division of the charges into multiple counts, double jeopardy, adequacy of the *Alderman* taint hearing, venue and jury selection, the constitutionality of § 1952 (the Travel Act), pre-indictment delay, and denial of severance. We conclude that the convictions should stand, and affirm.

The facts are dealt with in discussing the appellate contentions.

## I

## SUFFICIENCY OF THE EVIDENCE

a. *The unlawful activity and use of interstate facilities*

The three counts in the indictment were identical except for the time periods involved.[1] Count I encompassed the

---

1. Each count in the indictment alleged in pertinent part that:

within the State and District of Colorado, PAUL CLYDE VILLANO and PAULINE SMALDONE did use, cause to be used, and aid and abet the using of a communication facility in interstate commerce, that is, the interstate telephone, between Nebraska and Colorado, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving gambling in violation of Chapter 40, Article 10, Sections 7, 8 and 9, Colorado Revised Statutes 1963, as then amended, and thereafter, PAUL CLYDE VILLANO and PAULINE SMALDONE did perform, cause to be

period of November and December, 1970; count II covered the month of January, 1971; and count III the month of February, 1971.

 Since we are reviewing convictions on guilty verdicts we must view the proof in the light most favorable to the Government. *United States v. Pauldino,* 443 F.2d 1108, 1110 (10th Cir.), cert. denied, 404 U.S. 882, 92 S.Ct. 212, 30 L.Ed.2d 163. So viewed there was proof tending to show that Villano and Smaldone were in the bookmaking business during the period from November 1, 1970, through February 28, 1971. Villano handled substantial betting on football and basketball games with Denver residents who testified that he personally handled collections and payoffs (R. VI 330, 332–34; 347–48, 350–54).

From November, 1970, through February, 1971, Frank Amato worked as a telephone operator for a Denver bookmaker taking bets and providing line information. Amato worked five or six days a week in this position, serviced 20 to 30 customers by code number, and handled between $5,000 and $7,000 per day. Upon receipt of the bets he relayed them to a woman whose voice he recognized as defendant Pauline Smaldone's.[2] Amato specifically recalled receiving calls from a bettor who identified himself by the code number X–15 (R. V 142–45; 147; 150–51). In January, 1971, Amato was arrested by State authorities for gambling violations. Henry Veto, a professional bondsman, testified that after Amato's arrest he provided Amato's bond at the request and expense of Villano (R. V 148; R. VI 302–03).

During the indictment period Richard Colgan was employed by Villano as a telephone operator. He was paid by Villano in cash on a weekly basis. Colgan testified that he serviced approximately 50 customers and received an average of $25,000 to $35,000 in bets per week. After receiving bets Colgan relayed them to a woman known to him as Pauline who received this information at telephone number 237–9254 in Denver (R. V 154–55; 160–61). The Government's proof showed this number to be listed to C. M. Smaldone for Claudia Smaldone, 2997 Pearson Way, Denver, Colorado (Pl.Ex. 4). The owner of this residence during the period encompassed by the indictment was defendant Pauline Smaldone (Pl.Ex. 5, 6, 7). If the sports schedules required by Colgan were ever late he would call Pauline's number and they would be sent to him. If a bettor desired to exceed the $2,000 limit on any single bet, he was required to call Pauline and then defendant Villano would call him to either grant or deny him permission to accept the bet (R. V 161–62).

The evidence of interstate telephone calls came from Fud Ferris, Jr., a resident of Valentine, Nebraska, who owned restaurants in Valentine and North Platte. He testified that during the fall of 1970 and the spring of 1971, he placed bets with a Denver bookmaker by use of telephone facilities located in the two restaurants, his residence, and the residence of his sister-in-law in North Platte. Ferris said he had three phone numbers that he would call in Denver and that he used code number X–15 when placing all of his bets. Ferris stated, however, that he had never heard of Amato or Colgan. He testified that during the indictment period his highest betting might have been $5,000 in a week, but that there were some weeks he did not place any bets.

Ferris stated he traveled to Denver where he was paid his winnings by a man known to him as Paulie (R. V 104, 108).[3] However, in court Ferris was un-

---

performed, and aid and abet the performance of acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of said unlawful activity, all of the foregoing in violation of Title 18, United States Code, Sections 1952 and 2.

**2.** Amato testified that the purpose of relaying bets was so that in case of a raid, a phone

man would not be caught with betting records (R. V 144). Amato also stated that at times he relayed bets to a second woman for about two or three weeks, but he said he relayed most of his bets to Smaldone (R. V 145–46).

**3.** During the trial, several witnesses used the nickname "Paulie" when referring to defendant Villano (R. V 179, 186, 192; R. VI 365).

able to identify defendant Paul Villano as the person who paid him (R. V, 104). The time and place of payment would be previously arranged during his interstate telephone calls to Denver when he obtained line information and placed bets (R. V, 100–105). At the conclusion of Ferris's betting through the three Denver telephone numbers he owed $4,000 which he did not pay (R. V, 107–108).

Several of the telephone calls made by Ferris were corroborated by telephone company records. The records, together with the testimony of Ferris, Amato and Colgan, supported an inference that Ferris made numerous interstate telephone calls to numbers operated by Amato and Colgan during the indictment period.[4]

From the proof we are satisfied the jury could find beyond a reasonable doubt that Villano and Smaldone caused the use, or aided and abetted the use, of interstate phone facilities with the intent to promote and carry on and facilitate the promotion and carrying on of an unlawful activity—a business enterprise involving gambling in Colorado—and that they thereafter performed or attempted to perform such acts of promoting and carrying on or of facilitating the promotion and carrying on of unlawful gambling. Thus it appears that the proof supports the convictions for violation of § 1952.

**b. Adequacy of the proof in view of the *Rewis* decision**

Defendants' argument focuses on *Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493. They say that the evidence was only of a local gambling business, patronized sporadically by one non-resident and that *Rewis* holds that this does not constitute a federal offense (Joint Brief for Appellants, at 12). Reliance is placed on *Rewis,* on *United States v. Altobella,* 442 F.2d 310

4. The records showed calls as follows from the Nebraska phones used by Ferris:

| | | |
|---|---|---|
| Count I | Nov.–Dec., 1970 | 3 calls to Amato phones |
| Count II | January, 1971 | 7 calls to Amato phones |
| Count III | February, 1971 | 6 calls to Colgan phones |

Amato testified that he had worked three phone locations during the indictment period: 244–9221 (West Fourth Ave.), 427–2667 (Briarwood Apts.), and 244–9129 (Marion St.) (R. VI 268–69). Colgan stated that he had worked one phone location during the same period:

| Date | Number Called | Location |
|---|---|---|
| November 25, 1970 | 244–9221 | (Amato-West Fourth Ave.) |
| December 21 | 427–2667 | (Amato-Briarwood Apts.) |
| December 21 | 427–2667 | (Amato-Briarwood Apts.) |
| January 4, 1971 | 244–9129 | (Amato-Marion St.) |
| January 6 | " | " |
| January 7 | " | " |
| January 7 | " | " |
| January 7 | " | " |
| January 11 | " | " |
| January 11 | " | " |
| February 2, 1971 | 266–9781 | (Colgan-Pearl St.) |
| February 2 | " | " |
| February 6 | " | " |
| February 6 | " | " |
| February 6 | " | " |

266–9781 (Pearl St.) (R. V 157, 195; Pl.Ex. 3). The telephone number at Ferris' North Platte restaurant was 532–5340 (R. V 101, 222). Telephone records of this number established the following calls (Pl.Ex. 1):

The telephone number of Ferris' sister-in-law, in North Platte, Nebraska, was 532–2046 (R. V, 101, 222; Pl.Ex. 3). Phone records of her telephone showed that Colgan's Pearl Street number had been called on February 2, 1971 (Pl.Ex. 2).

(7th Cir.), on *United States v. McCormick,* 442 F.2d 316 (7th Cir.), and similar cases.

In *Rewis* there was a lottery or numbers operation in northern Florida near the Georgia line. Two defendants were Florida residents and there was no proof that they crossed state lines in connection with operation of their lottery. Two other defendants were Georgia residents who traveled to the Florida location to place bets. All defendants were found guilty; the Georgia defendants' convictions were reversed by the Fifth Circuit and those of the Florida defendants were reversed by the Supreme Court. Reviewing the language of the Travel Act and its legislative history, the Supreme Court pointed out the statute was aimed primarily at organized crime and specifically at persons residing in one State while operating illegal activities in another. It was concluded that Congress did not intend the Act to apply to criminal activity solely because that activity is at times patronized by persons from another State. 401 U.S. at 811–12, 91 S.Ct. 1056. We feel that the *Rewis* opinion does not call for reversal here.

The Travel Act provisions in question read in pertinent part:

§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

* * * * * *

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, . . .

From the terms of the statute itself we feel that the evidence supports the convictions. There was proof to sustain an inference that the defendants caused or aided and abetted the use by Colgan and Amato of interstate telephone facilities in furnishing line information, accepting bets and arranging payoffs with Ferris. True, the calls were placed by Ferris, but the betting transactions depended on more than silence at the other end of the line.[5] We feel the proven use of the interstate facility was substantial enough to support the convictions, although it was a small part of the overall gambling enterprise (see note 4, supra). There were several transactions conducted by use of an interstate facility, bringing the case within the prohibitions of § 1952(a).[6]

5. See *United States v. Tomeo,* 459 F.2d 445, 447 (10th Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 232, 34 L.Ed.2d 175 (decided under a different statute, 18 U.S.C.A. § 1084(a)); but see *United States v. Archer,* 486 F.2d 670, 683 (2d Cir.) (mere receipt of a foreign call from a federal undercover agent held insufficient for conviction under the Travel Act).

6. See H.R.Rep.No.966, 87th Cong., 1st Sess. (1961), U.S.Code Cong. & Ad.News (1961), p. 2665.

As originally proposed by Attorney General Kennedy, § 1952 (H.R. 6572, S. 1653) would have covered only travel; the use of the telephone was to be proscribed by 18 U.S.C.A. § 1084 (H.R. 7039, S. 1656), which forbids the use of wire communication facilities for the transmission of gambling information in interstate commerce. See Hearings on [H.R. 6572, H.R. 7039] Legislation Relating to Organized Crime Before Subcomm. No. 5 of the House Comm. on the Judiciary, 87th Cong., 1st Sess., ser. 16, at 20, 24–25 (1961); Hearings on [S. 1653, S. 1656] the Attorney General's Program to Curb Organized Crime and Racketeering Before the Senate Comm. on the Judiciary, 87th Cong., 1st Sess., at 11, 12, 15 (1961).

The Senate Judiciary Committee amended the travel bill to add an identical section prohibiting the use of "any facility for transportation in interstate or foreign commerce, including the mail." See S.Rep.No.644, 87th Cong., 1st Sess. (1961) U.S.Code Cong. & Admin.

We cannot agree that the Court's interpretation of the statute in *Rewis* calls for reversal of these convictions. The opinion does stress that the Act was aimed "at persons who reside in one State while operating or managing illegal activities located in another." 401 U.S. at 811, 91 S.Ct. at 1059. Nevertheless the reach of the statute was not limited to such circumstances. *Erlenbaugh v. United States,* 409 U.S. 239, 247, n. 21, 93 S.Ct. 477, 34 L.Ed.2d 446. The controlling observation in the *Rewis* case seems to be that the legislative history "strongly suggests that Congress did not intend that the Travel Act should apply to criminal activity solely because that activity is at times patronized by persons from another State." 401 U.S. at 812, 91 S.Ct. at 1059. This point, focusing on the interstate activity by *others,* is not dispositive here. For, as pointed out, the *defendants* situated their agents where they carried on transactions by using telephones, receiving local and interstate calls. Our examination of the statute, its legislative history and the *Rewis* opinion persuades us that on this record these convictions should be sustained.

We have considered *United States v. Altobello,* 442 F.2d 310 (7th Cir.), and *United States v. McCormick,* 442 F.2d 316 (7th Cir.).[7] The *Altobello* opinion reversed a conviction where the only use of interstate facilities was the cashing of a check drawn on an out-of-state bank by a blackmail victim to make a pay-off. The subsequent act was division of the money between the defendants. The court said that where the use of the interstate facility and subsequent act were that minimal and incidental to the scheme, no federal crime was committed. Id., 442 F.2d at 315.

In *United States v. McCormick,* 442 F.2d 316 (7th Cir.), a conviction was likewise reversed where the defendant, an Indiana lottery operator, advertised in a weekly newspaper for lottery salesmen. Of 15,000 papers distributed, some 200 to 500 were mailed out-of-state. The court said the interstate activities relied on by the Government were the acts of others and were not actively sought or made a part of the defendant's illegal activity, and that there was no showing the lottery depended on or included interstate operations. Id. at 318.

A plausible argument for reversal can be made on the basis of the *Altobello* and *McCormick* cases: the interstate calls were only from one man, Ferris, and the business generated by these interstate calls was not shown to be more than a relatively small part of the gambling business handled by Colgan and Amato. Nevertheless we have some doubt that that court would reverse these convictions since there was re-

News p. 2664. In explaining the amendment Senator Eastland remarked on the floor:

The committee is of the opinion that the bill should not be limited to the travel of individuals in interstate commerce. Other interstate transportation facilities may be used by organized crime to carry out unlawful activity. The bill therefore has been broadened . . . . .

107 Cong.Rec. 13943 (Part 10, 1961).

The conference committee then combined the two sections into the present form, but extended the scope of the Act in the process. For reasons that are not clear, all references to "transportation" in the Act were omitted, except for that which remains in its title. See H.R.Rep.No.1161, 87th Cong., 1st Sess., 1, 3 (1961).

While there is some question whether Congress intended "use of any facility" to apply to anything other than travel or transportation, courts faced with the question have construed § 1952 to apply to interstate telephone calls. See *United States v. Archer,* 486 F.2d 670, 679 n. 10 (2d Cir.), and cases cited therein. We also construe the language of the Act to cover the interstate use of telephones. Such interpretation does not violate the maxim that penal statutes be strictly construed, we feel, since "[i]t is sufficient if the words are given their fair meaning in accord with the evident intent of Congress." *United States v. Cook,* 384 U.S. 257, 262–63, 86 S.Ct. 1412, 1415, 16 L.Ed.2d 516.

7. See also *United States v. Isaacs,* 493 F.2d 1124, 1146–49 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146, and *United States v. Archer,* 486 F.2d 670 (2d Cir.), which bear some similarity to *Altobello* and *McCormick* as to incidental involvement of interstate facilities.

peated use of interstate communications which produced a substantial volume of gambling—although a small part of the proven operation. In any event, we are persuaded we should uphold the convictions on this record. There was repeated use of the interstate communications facilities by defendants' agents, despite out-of-state origin of the calls, and the statute's other requirements were met. Our conclusion is supported by *United States v. Sellaro,* 514 F.2d 114, 120–21 (8th Cir.), cert. denied, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681; see also *United States v. LeFaivre,* 507 F.2d 1288, 1294 (4th Cir.), cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762. We therefore reject the argument that the statute, as construed by *Rewis,* does not apply.

### c. *The question of knowledge of use of interstate facilities and the jury instruction thereon*

Lastly, defendants argue that their convictions cannot stand in view of lack of any knowledge by them that Amato or Colgan were receiving interstate calls, relying on *United States v. Barnes,* 383 F.2d 287 (6th Cir.), cert. denied, 389 U.S. 1040, 88 S.Ct. 780, 19 L.Ed.2d 831; and *United States v. Honeycutt,* 311 F.2d 660 (4th Cir.) (Joint Brief for Appellants at 18–19). And a closely related argument is made challenging the trial court's inclusion of a "run the risk" instruction.[8]

■ We are not persuaded that the *Barnes* or *Honeycutt* cases strictly apply here. They involved an attempt by the Government to fasten criminal liability on defendants by imposing responsibility for the conduct of a co-partner which offends another criminal statute—a fed-

eral one—even though such federally proscribed conduct was not shown to be necessary or usual to the partnership or known to the co-partners. See *United States v. Barnes, supra,* 383 F.2d at 292; *United States v. Honeycutt, supra,* 311 F.2d at 662–63. Here, instead, the proof supports a reasonable inference that the defendants were involved in a gambling operation with Amato and Colgan where the use of phones was apparent and where interstate calls were not unlikely. With this much proved, we feel it was not required under § 1952 to prove further that defendants knew they were causing or aiding and abetting the interstate use of the phone facilities.

■ Section 1952(a) condemns use of an interstate facility with intent to promote, etc., any unlawful activity, followed by a subsequent required act. It does not impose the additional requirement of intent to use an interstate facility for there to be a direct violation by the defendant's own conduct. *United States v. Sellaro, supra,* 514 F.2d at 120–21 (8th Cir.); *United States v. LeFaivre, supra,* 507 F.2d at 1297–98 (4th Cir.); *United States v. Erlenbaugh, supra,* 452 F.2d at 973 (7th Cir.), aff'd, 409 U.S. 239, 93 S.Ct. 477, 34 L.Ed.2d 446; *United States v. Roselli,* 432 F.2d 879, 891 (9th Cir.), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828. Likewise proof was not required here that the defendants, in causing or aiding and abetting use of the phone facilities, knew that they would be used for interstate calls. *United States v. LeFaivre, supra,* 507 F.2d at 1298.

■ We, therefore, conclude the proof was sufficient without establishing that the defendants knew the phones would be used for interstate calls. It follows also that the instruction to this effect

---

8. The trial court's instruction was as follows (R. VII 466–67):

I further instruct you that with respect to each count of the indictment, if you find that a particular defendant did in fact cause to be used or aid and abet the using of a facility in interstate commerce, it does not matter under the law that he may not have known that his actions involved the use of a facility in interstate commerce or that his actions

caused or aided and abetted the use of such facility. If that person performed an act with a specific intent to further a business enterprise involving gambling, which enterprise was in violation of the laws of the State of Colorado, he further ran the risk that his actions caused or aided and abetted the use of such facility in interstate commerce.

was proper. Cf. *United States v. Smaldone,* 485 F.2d 1333, 1348–49 (10th Cir.), cert. denied, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286.

## II

## THE CONSTITUTIONALITY OF THE TRAVEL ACT

Defendants argue that § 1952 violates the First, Fifth and Tenth Amendments and that it is not a valid enactment under the Commerce Clause provisions in Article I, Section 8, Clause 3, of the Federal Constitution. We disagree.

First, defendants say that the First Amendment is violated because the statute abridges freedom of speech and peaceable assembly; that due to the Act's vagueness, one traveling in interstate commerce must hesitate to discuss placing a bet or odds on point spreads, or even the scores of athletic contests, because of the broad terms in the statute such as "facilitate" and others.

■ The Act has, however, been construed not to apply to others where the proof showed only that they traveled into a State to place bets, *Rewis v. United States,* 418 F.2d 1218, 1220–21 (5th Cir.) (the holding of the Fifth Circuit on the Georgia residents).[9] And the *Rewis* opinion of the Supreme Court held that the statute did not apply to defendants where the proof merely showed their acceptance of wagers by such travelers. The statute covers those who travel in interstate commerce or use interstate facilities with the intent to promote, et cetera, an unlawful activity, and who commit further acts, and we feel such conduct is not sheltered by the First Amendment. The Amendment does not protect such "antisocial conduct which the government has a valid interest in proscribing." *Spinelli v. United States,* 382 F.2d 871, 890 (8th Cir.), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637; *United States v. Cerone,* 452 F.2d 274, 286 (7th Cir.), cert. denied,

405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240.

Second, defendants argue that § 1952 is void for vagueness and hence invalid under Fifth Amendment due process principles. They claim indefiniteness in the statutory terms, "promote, manage, establish, carry on, or facilitate . . ." and cite examples of uncertainty such as a janitor coming across a state line to clean up a gambling establishment. Reliance is placed, *inter alia,* on *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377, because of its holding that a required oath including a promise to "promote" respect for the flag and Federal and State institutions was unconstitutionally vague.

■ *Baggett v. Bullitt,* however, clearly dealt with indefinite statutes whose terms "abut upon sensitive areas of basic First Amendment freedoms." Id. at 372, 84 S.Ct. at 1323. That is not the case here. While the phrase including the word "promote" was held impermissibly vague in the First Amendment setting, we are satisfied that the statutory provisions in question here convey sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. *United States v. Petrillo,* 332 U.S. 1, 8, 67 S.Ct. 1538, 91 L.Ed. 1877; *Turf Center, Inc. v. United States,* 325 F.2d 793, 795 (9th Cir.). That there may be some borderline questions to decide is not fatal to the Act. We are reminded that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." *Nash v. United States,* 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232; *United States v. Powell,* 423 U.S. 87, ——, 96 S.Ct. 316, 46 L.Ed.2d 228.

In the context of the defendants' conduct and the statutory terms in question, we see no constitutional infirmity. And since the case is not one of intrusion into areas protected by the First Amend-

---

9. The Supreme Court expressed approval of this holding in its *Rewis* decision, 401 U.S. at 811, 91 S.Ct. 1056, although this question was not before the Court.

ment, we should not consider the further hypothetical cases suggested, being confined to the facts of the case at hand. *United States v. Powell, supra.*

■ Third, defendants argue that § 1952 violates equal protection principles incorporated by the Fifth Amendment since it operates differently in States where gambling is lawful from those where it is outlawed. We agree with the courts which have rejected this contention. *United States v. Schwartz,* 398 F.2d 464, 467 (7th Cir.), cert. denied, 393 U.S. 1062, 89 S.Ct. 714, 21 L.Ed.2d 705; *Turf Center, Inc. v. United States, supra,* 325 F.2d at 795–96; *United States v. Ryan,* 213 F.Supp. 763, 766 (D.Colo.).

■ Last, defendants say that regulation of gambling is not a power conferred on the Federal Government and hence § 1952 is invalid under the Tenth Amendment. We feel the argument is without merit. See *Marshall v. United States,* 355 F.2d 999, 1004 (9th Cir.), cert. denied, 385 U.S. 815, 87 S.Ct. 34, 17 L.Ed.2d 54.

### III

### THE ELECTRONIC SURVEILLANCE ISSUE

a. *The claim of taint from use of State wiretap information*

Defendants argue the prosecution is unlawful due to use by the Federal agents of illegal wiretapping information obtained from the Denver police, or that in any event there should be a remand for further proceedings on the taint issue, with directions that F.B.I. air telecommunications, not furnished to defendants previously, be made available to them (Joint Brief for Appellants at 31). Reliance is placed on *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176; *Nolan v. United States,* 423 F.2d 1031 (10th Cir.), cert. denied, 400 U.S. 848, 91 S.Ct. 47, 27 L.Ed.2d 85; and *United States v. Alderisio,* 424 F.2d 20 (10th Cir.).

The issue was raised by two pretrial motions to suppress all evidence of intercepted telephone communications and proof obtained as a result of leads therefrom for the reason that the evidence was illegally obtained (R. IX, 24–28). The motions were both denied. One motion was denied after a pretrial evidentiary hearing at which the trial court stated that there was no indication that there was or is any evidence that the Government has obtained as a result of electronic surveillance by the Denver Police Department, and therefore, there being no such evidence there was nothing to suppress and the motion was denied (R. III, 241).

The background facts concerning the issue follow. In February, 1971, the Denver police obtained a State Court order to intercept telephone conversations at the residence of one DeLuzio in Denver. During the wiretap, conversations of defendants Smaldone and Villano were recorded. Villano's voice was also identified in a second State wiretap conducted in 1972.

At the hearing on the motion to suppress, Sergeant Mulnix testified. Mulnix had been in charge of the State's wiretaps. He said that to his recollection, none of the tapes or transcripts of the recorded conversations were ever furnished to federal agents. He testified that on several occasions he had discussed Villano and Smaldone with agents Malone and Bush of the Denver FBI office and had informed them of the existence of the DeLuzio wiretap. He said that the discussions were of a general nature and that no FBI agent had ever requested the tapes or transcripts of the wiretap.

Agent Malone testified that in February, 1971, the Denver FBI office received a call from FBI agent Anderson in Nebraska. Anderson told Malone that he had received information that a person in Nebraska was placing wagers with a bookmaker in Colorado by telephone. Malone said that he first became aware that Villano was involved in the investigation in March, 1971, when he learned through a confidential informant in Colorado that Villano was taking wagers at a certain location. The phone

number at this location matched the phone number obtained from the Nebraska FBI office.

It was also some time in March, 1971, that Sergeant Mulnix had informed Malone of the DeLuzio wiretap, saying: "We are picking up information that DeLuzio is involved with the Smaldones in bookmaking." (R. III, 135). However, Malone testified that he had known since 1968 that defendants Villano and Smaldone were involved in bookmaking activities. Malone also said that as a result of information from the Nebraska FBI and his Colorado informant,[10] several persons were identified and called before a federal grand jury. Smaldone's involvement in the gambling activities in question here was discovered during testimony before the grand jury. Special Agent Bush testified to the same effect. He also said that he had talked with Sergeant Mulnix frequently. However, Bush's only inquiry concerning Villano was to ask Mulnix if there were any indication of interstate conversations on the DeLuzio wiretap, and Mulnix replied in the negative. Both Malone and Bush testified that they had never listened to the tapes nor read the transcripts of them. (R. III, 140, 204). And they said that none of the witnesses or evidence for this case developed as a result of any information received through any wiretap or electronic surveillance (R. III, 182, 211).

For their evidence of taint, the defendants rely primarily on two police reports sent by the Denver Police to the Denver FBI office (Def. Ex. G and H). These were factual summaries concerning State cases filed against various individuals. They contained affidavits making reference to the 1971 DeLuzio wiretap and the 1972 wiretap. Agent Bush said that the first report came into the FBI office some time in April, 1971. Bush said he looked through the report but that no investigation was made as a result of it. Agent Malone testified that the DeLuzio report first came to his attention in May or June, 1971; that he read it; that it generally referred to conversations; but that it did not contain the exact words that were used. He further said that in 1972, Mulnix told him there had been another wiretap in which Villano's voice was overheard. Malone read the second case summary concerning that wiretap, but no action was taken as a result of receiving the report.

Defendants argue that although agents Malone and Bush testified that information for the federal charges came from independent sources, the agents did have information on the existence and contents of the wiretaps which they could not put out of their minds. However, the defendants have not pointed to specific information the FBI was supposed to have received as a result of the State investigation. The police summary from the DeLuzio wiretap merely discusses in general Villano's bookmaking which was already known to Malone. The DeLuzio report is more informative as to defendant Smaldone's involvement, referring to the fact she was accepting wagers from DeLuzio at her residence on Pearson Way in Denver.

Despite the considerable information concerning gambling activities of both 'defendants in the reports, both Special Agents testified that information for these federal charges came from inde-

---

10. Malone testified that in February, 1971 they had received a call from Agent Anderson in Nebraska who said he had received information indicating a person in Nebraska was placing wagers with a bookmaker in Colorado by phone. In subsequent calls to Anderson a correction to the phone number in Denver was obtained. With that correction and information received from a Colorado informant, and by going to this location, Malone was able to verify the number. Malone received information from Omaha showing that several calls were to the same number indicated by a Colorado informant who had told Malone about a location where Villano was conducting his bookmaking (R. III, 132–33, 178–79). While the police reports (Def. Ex. G and H), gave information that both defendants were involved in gambling, Malone said he had known for several years of their gambling activities (R. III, 141–42).

pendent sources. The testimony at the adversary hearing satisfied the trial court and it was found that there was no indication that there was or is any evidence that the Government had obtained as a result of the Denver Police surveillance. The court concluded that there being no such evidence, the motion to suppress would be denied.

 The initial burden to show that an unlawful surveillance occurred rested on the defendants. *Nolan v. United States, supra,* 423 F.2d at 1041. Where such an illegal search has come to light, the Government has the ultimate burden of persuasion to show that its evidence is untainted. *Alderman v. United States, supra,* 394 U.S. at 183, 89 S.Ct. 961. At the same time, the defendant is required to "go forward with specific evidence demonstrating taint." Id.; 423 F.2d *Nolan* at 1041. Without considering whether an unlawful surveillance was shown,[11] the trial court found there was no Government evidence resulting from the Denver Police Department's electronic surveillance and denied the motion to suppress (R. III, 241). We feel the finding is amply supported and should be sustained.

b. *The claim of error in denying access to the airtels*

The defendants claim that the trial court erred in denying them an opportunity to examine F.B.I. air telecommunications (airtels).[12] Defendants say they were entitled to examine the airtels and other documents, which are not specified, to proceed with the evidence to show

that the case was tainted. The argument is that *Alderman* should not be limited to revealing the wiretaps themselves, but that the rationale of *Alderman* should be applied equally to the fruits of the recordings (Joint Brief for Appellants at 27, 29), relying on *United States v. Alderisio,* 424 F.2d 20 (10th Cir.).

In *Alderisio,* this court held that since the tapes and complete logs of them were lacking, the defendant was entitled to examine that portion of the airtels relating to the monitored conversations not described in the logs, "if any there be." Id. at 23. Here, however, the transcripts of the monitored conversations were furnished to the defendants (Joint Brief for Appellants, 27). The Supreme Court has recognized that "[n]othing in Alderman . . . requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance." *Taglianetti v. United States,* 394 U.S. 316, 317, 89 S.Ct. 1099, 1100, 22 L.Ed.2d 302. In fact, the general rule appears to be that the defendant is entitled to see a transcript of his own conversations, and nothing else, having no right to rummage in Government files. Id. at 317, 89 S.Ct. 1099; *Alderman, supra,* 394 U.S. at 185, 89 S.Ct. 961.

██ The Court has observed that the defendant, armed with specified records of overheard conversations and with the right to cross-examine appropriate officials in regard to the connection between those records and the case made against him, may need or be entitled to nothing

---

**11.** The defendants argue that the Government admitted the unlawfulness of the Denver wiretaps. At the suppression hearing Government counsel did state that the wiretap "would perhaps not pass federal muster because of the lack of reporting to the Court . . ." (R. II, 120). The trial court apparently found it unnecessary to determine whether the defendants' initial burden of showing unlawfulness of the surveillance was met, and instead found that no showing of taint was made. Since we feel that this finding is supported by the record, we likewise need not decide whether an unlawful surveillance was demonstrated.

**12.** Airtels (air telecommunications) are a form of interoffice communication between FBI field offices. Often, but apparently not always, airtels are used to transmit summaries of information contained in logs of recorded conversations. See, *e. g., United States v. Alderisio,* 424 F.2d 20, 22 (10th Cir.); *United States v. Battaglia,* 432 F.2d 1115, 1117 n. 1 (7th Cir.), cert. denied, 401 U.S. 924, 91 S.Ct. 868, 27 L.Ed.2d 828; *United States v. Mirro,* 435 F.2d 839, 841 (7th Cir.); *United States v. Hoffa,* 436 F.2d 1243, 1247 (7th Cir.), cert. denied, 400 U.S. 1000, 91 S.Ct. 455, 27 L.Ed.2d 451.

else. Id. Here the trial court determined that the defendants were not entitled to the additional records. We find no abuse of the discretion which rested on the trial court. *Alderman, supra* at 185, 89 S.Ct. 961; *United States v. Kane*, 450 F.2d 77, 82 (5th Cir.), cert. denied, 405 U.S. 934, 92 S.Ct. 954, 30 L.Ed.2d 810; *United States v. Hoffa*, 436 F.2d 1243, 1247 (7th Cir.), cert. denied, 400 U.S. 1000, 91 S.Ct. 455, 27 L.Ed.2d 451; *United States v. Mirro*, 435 F.2d 839, 841 (7th Cir.).[13]

#### c. *The 1964 electronic surveillance*

On the first day of the trial the Government reported from a complete check through federal agencies that in 1964 an IRS agent had monitored Villano's telephone calls and that Villano had been interviewed by an IRS agent wearing a recorder (R. V, 5–6). Defense counsel requested a hearing to determine the extent of any taint from this surveillance. The Government objected, arguing that 18 U.S.C.A. § 3504(a)(3) barred any consideration of taint arising from such circumstances, and that the previous hearing on the State wiretaps had demonstrated that the Government's investigation of defendants' Travel Act violations was not connected with any other such surveillance. The trial court denied the defense requested for a hearing without stating its reasons.

▮▮▮▮ In resisting this claim of procedural error by the defendants, the Government renews both arguments made to the trial court. Without reaching the issue of the constitutionality of 18 U.S.C.A. § 3504(a)(3), which defendants challenge, we agree with the Government's alternative position. Evidence unlawfully obtained need not be suppressed if the causal connection between the unlawful Government conduct and the proof in question has "become so attenuated as to dissipate the taint. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307; *Wong Sun v. United States*, 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441. Agent Malone had previously testified he had no knowledge of any electronic surveillance of the defendants by federal agencies (R. III, 164–65). There was no showing of a connection or similarity between Villano's 1964 operations and the 1971 conduct under prosecution. We must agree the request for the hearing was properly denied.

### IV

### PRE–INDICTMENT DELAY

Defendants assert that there was prejudicial delay from the time of the Government's being informed of this case until indictment. They point to the FBI having had information of a possible violation in February, 1971, and the indictment not having been returned until January 11, 1974. They claim loss of evidence and prejudice in violation of their Sixth Amendment right to a speedy trial and their Fifth Amendment due process rights, relying on *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468; *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, and similar cases (Joint Brief for Appellants, 48–51). The trial court denied a motion to dismiss on these grounds, without comment (R. III, 240).

The claim of prejudice is based primarily on the fact that the Government requested preservation of certain phone records, which were introduced (Pl. Ex. 1–4), while other phone records that would have aided the defense were destroyed pursuant to a policy of the telephone company to destroy such phone records after six months. Defendants point to a serious contradiction in Ferris'

---

13. The trial court examined the airtels in camera and stated that they contained no indication of use by the Denver or Omaha office of any improper source, particularly the electronic surveillance by the Denver Police Department, as the basis for the investigation or indictment, and denied access to them to the defendants (R. III, 237–38). We have examined the same material and are satisfied there was no error or abuse of discretion by the trial court.

testimony when he stated on cross-examination that his calls from Nebraska occurred a year earlier than the indictment period (R. V, 129, 134).[14] Using this as a predicate, defendants argue that missing records of calls from Ferris' Valentine, Nebraska, telephones would have further contradicted much of Ferris' testimony.[15] Moreover, they say other lost records would have been relevant to determine whether long distance calls were made by defendants or by Colgan or Amato, and that some witnesses became unavailable because of the delay (Joint Brief for Appellants, 49–50).

■ We cannot accept the claim of substantial prejudice to the defendants. Even if the lost Valentine phone records had shown that no calls were made to the Denver numbers of Colgan and Amato, the impeachment value would have been minimal. Ferris testified that he made calls from North Platte, and this was supported by the records (see note 4, *supra*). He said there were some weeks during the indictment period in which he did not bet, and a showing that no calls were made from the other locations would have detracted but little from the showing of repeated calls supported by the records.

■ As for the destruction of the records for defendants' phones and for the phones used by Amato and Colgan, we see no way in which they could have aided defendants and none has been demonstrated. Nor have defendants stated with any particularity what witnesses were unavailable to them as a result of the delay, or for that matter, what exculpatory testimony would have been offered. See *United States v. Mer-*

*rick,* 464 F.2d 1087, 1090–91 (10th Cir.), cert. denied, 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314.

■ We are satisfied that there was no showing of substantial prejudice to the defendants' right to a fair trial or that the delay was an intentional device to gain a tactical advantage over the accused, thus denying due process. *United States v. Marion, supra,* 404 U.S. at 324, 92 S.Ct. 455; *United States v. Merrick, supra,* 464 F.2d at 1090–91. The indictment was filed well within the five-year limitation period, 18 U.S.C.A. § 3282, thus affording the general protection provided by law against obscuring of facts by the passage of time and punishment for acts of the far distant past. *Marion, supra,* 404 U.S. at 323, 92 S.Ct. 455. The speedy trial guarantee began operating when the defendants were indicted, *Marion, supra* at 313, 92 S.Ct. 455, and there is no showing of excessive delay or prejudice thereafter since the trial commenced four months later. We must reject the claims of violation of Fifth and Sixth Amendment rights.

## V

## DOUBLE JEOPARDY

■ Defendants claim violation of the Fifth Amendment prohibition against double jeopardy. The argument is that they were charged, convicted and punished by the Colorado State courts for gambling violations during the same continuous periods of time covered by this federal indictment, and that the additional prosecution and punishment by the Federal Government was barred, relying on *Waller v. Florida,* 397 U.S. 387,

---

**14.** Ferris testified before the grand jury, and at trial, that his betting was during the 1969–1970 season and that this was the only football season when he made bets through the Denver numbers. The record shows that the defendants had the grand jury transcript, cross-examined effectively with it, and developed the contradiction before the trial jury. On redirect, however, Ferris corrected his testimony to correspond with the indictment period, and the jury apparently accepted it.

**15.** The only records of interstate calls introduced into evidence were those from Ferris' North Platte, Nebraska, telephones. See note 4, *supra.* Ferris also testified that he made calls from his home and business in Valentine, Nebraska, but records of these numbers were not introduced, apparently because they had been destroyed. Other records lost included the long distance records for the phones used by Amato and Colgan, and for any phones to which the defendants had access.

90 S.Ct. 1184, 25 L.Ed.2d 435; *United States v. Crawford*, 466 F.2d 1155 (10th Cir.), *inter alia.*

It is clear that the double jeopardy argument lacks merit. The *Waller* case in no way departs from the established rule permitting successive prosecutions by the Federal and State governments as separate sovereigns. *Waller*, supra, 397 U.S. at 392, 90 S.Ct. 1184, and cases there cited; *United States v. Smaldone*, 485 F.2d 1333, 1343 (10th Cir.), cert. denied, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286. The *Waller* opinion only barred separate prosecutions by a State court and a municipal court since the judicial power of both courts sprang from the same organic law. *Waller, supra*, 397 U.S. at 393, 90 S.Ct. 1184.

Nor does *United States v. Crawford, supra*, aid the defendants. Relief was granted there against a second conviction because of the peculiar factual circumstances. The defendant had served a Wyoming sentence for having stolen the subject car in Wyoming (a reduced State charge of petty larceny), and was later convicted in Federal court under the Dyer Act for having stolen the car in Colorado and transporting it to Wyoming. The court said the defendant could not have been guilty of both these offenses, nor could he have been guilty of a Dyer Act violation and the original Wyoming charge of receiving the stolen property in Wyoming. In either event the factual premise for the State conviction negated guilt under the Dyer Act. The case was one of relief under the court's supervisory power on the basis of these special facts and inherent unfairness, and not due to any prohibition of separate federal and state prosecutions. 466 F.2d at 1156–57.

We must reject the double jeopardy argument as untenable.

## VI

## MULTIPLE COUNTS AND SEPARATE FINES

Defendants further assert that they were unlawfully subjected to prosecution under multiple counts and given multiple fines.[16] They point out that the proof did not focus on their activities separately as to any period of time; that the operations of Amato and Colgan overlapped in time; and that there was only one interstate bettor. They say the Government arbitrarily charged separate offenses when the statute is concerned with "unlawful activity" which cannot exist without continuing activity, and that the multiple convictions and fines violate the intent of Congress and amount to double jeopardy and cruel and unusual punishment.

*Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 and *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260, clearly tell us that in construing federal statutes to decide the allowable unit of prosecution, doubt will be resolved against turning a single transaction into multiple offenses. *Bell, supra*, 349 U.S. at 84, 75 S.Ct. 620; *Universal C.I.T. Corp., supra*, 344 U.S. at 221–22, 73 S.Ct. 227. However, the statute seems clear to us here, as the court said in *United States v. Polizzi*, 500 F.2d 856, 897 (9th Cir.), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820: "The offense defined is an act of travel or use of an interstate facility, with the requisite intent, plus subsequent performance of another act of the kind specified in the statute." The continuing "unlawful activity" is part of the required elements, but the key element for the federal offense is the act of travel or use of interstate facilities. This follows the persuasive logic of Judge Murrah in a

---

**16.** As stated, the three counts covered three successive time periods. Defendant Villano was sentenced to concurrent sentences of one year and a day on each count, plus separate fines of $750 on each count, or a total fine of

$2,250. Defendant Smaldone's sentence was suspended and she was placed on two years' concurrent probation on each count. She was also given fines of $750 on each count, or a total fine of $2,250.

similar situation. *Mitchell v. United States*, 142 F.2d 480, 481 (10th Cir.), cert. denied 323 U.S. 747, 65 S.Ct. 49, 89 L.Ed. 598. Hence charging separate offenses here was not unwarranted and the separate convictions and punishment given were not improper on this proof.

We find that these objections to the separate convictions and the sentences are all without merit.

We have examined the several remaining contentions of defendants concerning, among other things, the denial of a severance, denial of a change of venue, sufficiency of telephone voice identification, and jury instructions. We see no substance to the points and no further discussion is necessary. We are satisfied that the defendants had a fair trial, free of prejudicial error.

Affirmed.