UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas TRIPP, Defendant-Appellant.

No. 85–1031.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 3, 1985.
Decided Jan. 16, 1986.

Craig A. Daly, Detroit, Mich., for defendant-appellant.

David J. McKeon, Maura D. Corrigan, Asst. U.S. Attys., Detroit, Mich., William C. Bryson, argued, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before MARTIN and CONTIE, Circuit Judges, and PECK, Senior Circuit Judge.

CONTIE, Circuit Judge.

Thomas Tripp appeals from his convictions for violation of 18 U.S.C. § 1962(c), (d). For the reasons that follow, Tripp's convictions are affirmed.

## I.

On March 21, 1984, defendant Thomas Tripp was indicted on three counts of violation of 18 U.S.C. §§ 1962(c), (d), and 1951. Count I alleged that Tripp together with Robert J. Doniere, Frank Joseph, Dean E. Knopp, Samuel Giordano, Anthony Palazzolo, Donald R. Christy and David G. Dewood, Jr. was engaged in an "enterprise" pursuant to 18 U.S.C. § 1961(4) for the purpose of engaging in violations of Ohio Rev.Code § 2915.02, Mich.Comp.Laws Ann. §§ 750.157b, .301, .314, 18 U.S.C. §§ 891–894, 18 U.S.C. § 1951, 18 U.S.C. § 1952, 18 U.S.C. § 1961(6), and 18 U.S.C. § 2421. As part of this "enterprise," the indictment listed twenty "unlawful debts," 18 U.S.C. § 1961(6), which the defendants had collected. Tripp was implicated in collections from Paul Stark, Albert Bifano, Robert Kohler, Albert Perras, Anthony Falzone, Robert Miller, and John Pantanella. As part of the pattern of racketeering which Tripp was alleged to have engaged in, the indictment alleged conspiracy to violate Mich.Comp.Laws Ann. § 750.157a(b), .301, .314, and conspiracy to violate 18 U.S.C. § 1951. Count II alleged that defendants conspired to violate 18 U.S.C. § 1962(d) by conspiring to collect unlawful debts, debts incurred in gambling schemes which violated Ohio and Michigan gambling laws. This conspiracy was allegedly effected through high stakes card games using a rigged deck.

Tripp's counts were tried to a jury September 5, 1984 to September 24, 1984. The following evidence was received at trial.

The government's principal witness was Robert Doniere who was testifying pursuant to a plea agreement. Doniere testified that he met Tripp several years prior to the trial while losing several hundred dollars in a game of blackjack at which Tripp was present. Tripp told Doniere not to worry about the losses but to bring some customers to the card table in the future. Doniere described the scheme as follows:

> [W]e would pick out a customer to bring to a card game. Mr. Tripp and myself would talk it over. He would either okay it or tell me not to bring the guy. I would bring him. If he was okay, we would bring him, and from there we would play him cards and the guy would lose and I would collect the money.

Doniere gave the money to Tripp and was paid each time. The games took place at hotels near Toledo. The group selected "customers" with a lot of money and lured them to the games with sex. Doniere indicated that he sometimes paid women to be present at the games. The scheme lasted for five or six years with twenty to twenty-five victims. Once when Doniere beat a prospective customer at pool and lost him from the card game, Tripp told him "that people wind up in trunks for less than that." Another time Doniere collected $26,000 which an individual named Corky lost in a card game. Doniere also testified that Tripp advised him to lie to the grand jury.

Doniere testified that he collected gambling debts from several individuals. He stated that he collected $10–12,000 lost by a person named Mallendick at a game at which Tripp was present; Doniere gave the money to Tripp. Doniere testified further that at the direction of Tripp and Palazzolo he persuaded a Dr. Paput to play in a game in which the doctor lost $40,000 to $50,000. Doniere collected the entire sum and was paid four or five thousand dollars for the collection. Doniere also testified that he collected debts from other people including Bifano, Kohler, Perras, Falzone and Miller.

John Hancock testified that Doniere took him to a card game in which Tripp was dealing and Doniere and Hancock were partners. Doniere and Hancock got a very good poker hand but lost $52,000. Hancock paid Doniere $26,000. Hancock later lost a similar amount in a poker game at which Tripp was present and dealing.

Paul Stark testified that he played poker with Doniere, and lost $10,000 to Tripp. Albert Bifano testified that Doniere invited him to a card game, before which the two had drinks and then Bifano felt "hazy." Bifano could not identify the participants in the card game, but he lost $28,000.

Robert Kohler, a general contractor in Toledo, testified that Doniere approached him with a business proposition and got him involved in a card game playing Doniere's hand. Kohler won several times. Kohler sought to have Doniere take his hand back, but Tripp and the others encouraged him to play. Doniere resumed playing but referred to the hand as "ours," Doniere and Kohler's, and after the hand was lost, Doniere attempted to collect half of the loss ($48,000) from Kohler. Kohler eventually paid $10,000.

John Pantanella testified that he lost $1,500 to Tripp in a poker game in which he was offered sexual favors. In a later game, Pantanella, after having about five drinks, lost more than $10,000. Richard Anderson testified that he knew Doniere through business. Anderson, through a Patricia Hendrix, ended up at the card game and had two beers, which, he testified, made him feel drugged. Playing a game called Polish poker with Hendrix as a partner, Anderson lost a substantial sum of money.

Thomas Janovsky, a forensic chemist with the Drug Enforcement Administration (DEA) and qualified as an expert by the court, testified that evidence he examined consisted of scopolamine hydrobromide and potassium antimonyl tartrate (PAT). Richard Dittus, a pharmacist at Century Drug also qualified as an expert, testified that PAT is not used with human beings and if ingested causes gastrointestinal upset including nausea, vomiting and diarrhea. Dittus testified that scopolamine hydrobromide causes disorientation, flushing, and blurring of vision. Dittus stated that probably neither PAT nor scopolamine hydrobromide would be noticeable in a mixed drink.

Donald Christy testified that he went to high school with Tripp, and when he participated in the card games, Tripp told him, "You are to sit on my right-hand side and when I place the cards down like this, you don't cut them. When I place them down like this, you cut them." Christy also participated in collections. One game took place at Christy's home.

Thomas Tripp testified that he had gambled since he was a teenager and was an accomplished poker player. Tripp indicated that he met Doniere at a golf outing and that Doniere said he might be interested in Tripp as a salesman. Tripp eventually accepted the position as a salesman and accompanied Doniere on visits to customers. According to Tripp, Doniere also had discussions with him about managing a health club or providing security for a trade center Doniere was remodeling. Tripp admitted that he had played cards with Doniere but denied that Doniere had ever collected money for him or that they had conspired to induce particular individuals to play in the card games.

Tripp further testified that he had met Tony Palazzolo through Doniere but that he had never discussed card games with Palazzolo. Tripp also stated that he had played cards with Kohler and won, but he denied that he had ever received money from Kohler or conspired with him to gamble. Tripp denied playing cards with Dr. Perras, Dr. Briskin, Anthony Falzone, or Bifano. He stated that he had brought Christy and Doniere together after Doniere had asked Tripp about purchasing an airplane. Tripp admitted that he and Christy were together at card games but denied giving Christy pills and cheating at cards. Tripp also denied any knowledge about scopolamine hydrobromide or PAT.

The district court allowed the government to introduce evidence pursuant to Fed.R.Evid. 404(b) in the form of Robert Doniere's testimony involving games with Paput, Mallendick, Baisdon, and Falzone. Tripp was present at all the games and these games occurred within the time

frame of the conspiracy alleged in the indictment.

On September 24, 1984, Tripp was convicted by the jury of violating 18 U.S.C. § 1962(c), (d).

## II.

Tripp raises five assignments of error which we consider below.

### A.

■ Tripp argues that the evidence of card games not alleged in the indictment was not properly admitted pursuant to Fed. R.Evid. 403, 404(b), and that the district court erred in failing to give a cautionary instruction limiting the jury's consideration of the alleged "other acts." The government contends that the evidence is properly admissible on the ground that the evidence is not "other acts" subject to Rule 404.

While we agree with the government that the additional card games testified to by Doniere did not constitute "other acts" subject to the requirements of Rule 404(b) and that such evidence was admissible as evidence of the conspiracy, *United States v. Zielie*, 734 F.2d 1447, 1456 (11th Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985); *United States v. Gigante*, 729 F.2d 78, 84 (2d Cir.), *cert. denied*, 467 U.S. 1206, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984); *United States v. Abadi*, 706 F.2d 178, 181 (6th Cir.), *cert. denied*, 464 U.S. 821, 104 S.Ct. 86, 78 L.Ed.2d 95 (1983); *United States v. Meyers*, 646 F.2d 1142, 1146 (6th Cir.1981); *United States v. Aleman*, 592 F.2d 881, 885 (5th Cir.1979), the balancing of potential prejudice and probative value required by Rule 403 is still applicable. Since the card games which took place during the conspiracy are plainly relevant to the issue of conspiracy, any prejudice which Tripp might incur due to the introduction of the evidence is outweighed by the probative value of such evidence. We perceive no abuse of discretion by the district court in this regard. *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir.1982).

### B.

■ Tripp contends that the trial court erred by failing to instruct the jury that the government must prove two overt acts in order to support a conspiracy conviction pursuant to 18 U.S.C. § 1962(d).

We find this argument plainly without merit. Case law holds clearly that an agreement to commit a substantive RICO violation is sufficient to sustain a conspiracy conviction, *United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir.1985); *United States v. Weinstein*, 76 F.2d 1522, 1536 (11th Cir. 1985); *United States v. Tille*, 729 F.2d 615, 619 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984); *United States v. Brooklier*, 685 F.2d 1208, 1220 (9th Cir.1982), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983); *United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983), and that 18 U.S.C. § 1962(d) does not require proof of an overt act, *United States v. Pepe*, 747 F.2d 632, 645 n. 8 (11th Cir. 1984); *United States v. Carter*, 721 F.2d 1514, 1528 n. 20 (11th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984); *United States v. Coia*, 719 F.2d 1120, 1123–24 (11th Cir.1983), *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984); *United States v. Barton*, 647 F.2d 224, 237 (2d Cir.1981). *But see United States v. Boldin*, 772 F.2d 719, 727 (11th Cir.1985). In light of this case law and the absence in the statute of any support for requiring two overt acts, we find no error in the district court's instructions.

### C.

■ Tripp asserts that the RICO statute, by adopting the laws of the states in defining "racketeering activity," 18 U.S.C. § 1961(1), violates the Fifth Amendment Due Process Clause by creating a lack of national uniformity and by not properly notifying a person that his conduct is il-

legal. Accordingly, Tripp argues, the statute is void for vagueness.

This court and others have squarely rejected the argument that the federal racketeering statute is unconstitutionally vague. *See United States v. Morelli,* 643 F.2d 402, 412 (6th Cir.), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); *United States v. Aleman,* 609 F.2d 298, 305 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Huber,* 603 F.2d 387, 393 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. Swiderski,* 593 F.2d 1246, 1249 (D.C.Cir.1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979); *United States v. Hawes,* 529 F.2d 472, 478–79 (5th Cir.1976); *United States v. Campanale,* 518 F.2d 352, 364 (9th Cir.1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *United States v. Cappetto,* 502 F.2d 1351, 1357–58 (7th Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). Nor is there any constitutional objection to a criminal statute that incorporates state law for purposes of defining illegal conduct. *United States v. Morrison,* 531 F.2d 1089, 1093 (1st Cir.), *cert. denied,* 429 U.S. 837, 97 S.Ct. 104, 50 L.Ed.2d 103 (1976); *United States v. Sacco,* 491 F.2d 995, 1003 (9th Cir.1974) *(en banc); United States v. Smaldone,* 485 F.2d 1333, 1342–43 (10th Cir.1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974); *Marshall v. United States,* 355 F.2d 999, 1003–04 (9th Cir.), *cert. denied,* 385 U.S. 815, 87 S.Ct. 34, 17 L.Ed.2d 54 (1966). That is true even if the result is that conduct that is lawful under the federal statute in one state is unlawful in another. *See United States v. Abramson,* 553 F.2d 1164, 1173 (8th Cir.), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); *United States v. Villano,* 529 F.2d 1046, 1056 (10th Cir.), *cert. denied,* 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976); *Hawes,* 529 F.2d at 477; *United States v. Wolk,* 466

F.2d 1143, 1146 n. 2 (8th Cir.1972); *Schneider v. United States,* 459 F.2d 540, 542–43 (8th Cir.), *cert. denied,* 409 U.S. 877, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972).

Tripp's precise objections are difficult to discern from his brief. 18 U.S.C. § 1961(1)(A) provides:

> "racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year.

Tripp does not allege that the state offenses involved herein themselves are "void-for-vagueness." In the absence of elucidation regarding the specific infirmities in the statute, we find no cause to depart from precedent, and find that the statute, in light of the underlying state offenses, gives sufficient notice of the conduct proscribed.[1]

### D.

■ Tripp argues that the activities in which he engaged did not constitute "gambling" under either Ohio or Michigan law, but rather constituted larceny by trick, since the poker games were shown to be fixed. Therefore, Tripp contends, under such facts, these "rigged" poker games were not predicate acts illegal under state law as required by 18 U.S.C. § 1961(1).

The district court rejected this argument ruling that the poker games violated the Ohio and Michigan gambling statutes even if the games were rigged. The court pointed out that under the government's theory of the case, each of the poker games began with "honest" gambling, and it was only after the game had proceeded for some period of time that the dealer would insert a rigged deck and cheat the "mark" out of a large sum of money. Therefore, the court concluded, traditional gambling was apparently involved in every game referred

---

1. *Nemetz v. INS,* 647 F.2d 432 (4th Cir.1981), cited by Tripp is so plainly distinguishable, that it merits no discussion.

to in the indictment. But even assuming that the card games were rigged from the start, the court held, the elimination of the element of chance would not affect the analysis, since the card games still clearly "involved" gambling, within the meaning of the RICO statute, 18 U.S.C. § 1961(1)(A). "To find that 'honest' gambling states a RICO violation and 'dishonest' gambling does not would be an absurd result, particularly here where the indictment alleged illegal activities of a large-scale organized nature, which was the target of RICO," the court held.

The pertinent Michigan gambling statute, Mich.Comp.Laws Ann. § 750.314, makes it unlawful for any person "by playing at cards ... or by betting or putting up money on cards ... [to] win or obtain any sum of money or any goods." By its terms, that statute covers both "honest" gambling and "dishonest" gambling, inasmuch as both honest and dishonest gamblers "put up money on cards" to "obtain ... money" as a result. Thus, even if Tripp's games were rigged from the start, they still ran afoul of the Michigan statute, since Tripp was indisputably engaged in "putting up money on cards" in order to "win or obtain any sum of money or goods."

The pertinent Ohio statute, Ohio Rev. Code Ann. § 2915.02(A)(2) makes it unlawful for anyone to "promote, or operate, or knowingly engage in conduct that facilitates any scheme or game of chance conducted for profit." The same statute also makes it unlawful for anyone to "engage in betting ... as a substantial source of income or livelihood." Section 2915.02(A)(4). The term "game of chance" is defined to include poker, and the term "bet" is defined to mean "the hazarding of anything of value upon the result of an event, undertaking or contingency." Section 2915.-01(B), (D).

Both clauses of the Ohio statute would reach the conduct at issue in this case. The statute declares poker to be a "game of chance" by definition. Thus, operating a poker game for profit is a violation of the statute without regard to the degree of chance involved in the particular poker game at issue. *See Mills-Jennings of Ohio, Inc. v. Department of Liquor Control,* 70 Ohio St.2d 95, 435 N.E.2d 407 (1982). Because Tripp promoted, operated, and engaged in games of poker for profit, he fell within the first clause of the Ohio statute. Further, Tripp was engaged in "betting" as a substantial source of income, since he hazarded large sums of money upon the result of an event or undertaking. Therefore, even though Tripp's money may not have been substantially at risk during the fixed poker games, he was still engaged in "gambling" within the meaning of both Michigan and Ohio law. Accordingly, the district court did not err in refusing to instruct the jury that "rigged" poker games could constitute an "act ... involving ... gambling ... which is chargeable under State law."

**E.**

■ Tripp contends that the district court erred in refusing to give the following instruction regarding expert witnesses.

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. An exception to this rule exists as to those whom we call "expert witnesses". Witnesses who, by education and experience, have become expert in some art, science, profession, or calling, may state an opinion as to relevant and material matter, in which they profess to be expert, and may also state their reasons for the opinion.

While such an instruction is generally appropriate, *United States v. Jackson,* 425 F.2d 574, 577 (D.C.Cir.1970), failure to include such an instruction is not reversible error if the "charge, considered as a whole, includes the principle of the tendered instruction." *United States v. McCarty,* 440 F.2d 681, 682 (6th Cir.1971). *See also United States v. Stull,* 521 F.2d 687, 691 (6th Cir.1975), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976). The district court instructed the jury that they were the "sole judges of the credibility of witnesses and the weight and value to be given to their testimony." A similar instruction was deemed sufficient in *Stull,* where the expert's testimony comprised

only one page of transcript and provided only background information and did not directly implicate the defendants.

In this case, the first expert, Thomas Janovsky, after being qualified, testified that he analyzed the drugs in question and that one was scopolamine hydrobromide and the other potassium antimonyl tartrate. The second expert, Richard Dittus, was qualified, and testified as to the effects of potassium antimonyl tartrate (gastrointestinal upset) and scopolamine hydrobromide (pre-anaesthetic drug which could cause disorientation). This expert testified that the drug did not mix well with "activit[ies] which require mental activity," and responded in the affirmative to counsel's question "For example, gambling?" However, neither expert implicated any of the defendants. It was only through the testimony of others that the jury could conclude that Tripp had given these particular drugs to co-defendant Christy, and may have used them in the past in his gambling activities.

Accordingly, we find no error in the court's failure to deliver the tendered instruction.[2]

Accordingly, the judgment of the district court is AFFIRMED.

---

**2.** Any error in this regard, would, of course, be plainly harmless. *United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984).