[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16000
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 29, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00298-CR-J-32-MCR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL LEO HARRIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 29, 2009)

Before BLACK, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Michael Leo Harris appeals his conviction for possession of a firearm by a

convicted felon, in violation of 18 U.S.C. § 922(g).  After review, we affirm.

## I.  BACKGROUND

In November 2007, Harris was indicted on one count of possession of a firearm by a convicted felon.  Before trial, the parties stipulated that Harris was a convicted felon.  Thus, the only issue at trial was whether Harris possessed a firearm.

At trial, Christopher Potter, a detective and former patrol officer with the Jacksonville Sheriff's Office, testified that he and Officer Alex Carrion responded to a reported automobile crash with injuries and found Harris lying on the ground a few feet from an overturned motorcycle.  Harris rolled over, and Officer Potter saw a gun tucked into Harris's waistband.  Harris moved his hand toward the gun, and Officer Potter drew his own gun and kicked Harris's hand away from the gun in Harris's waistband.

There were two others at the scene: a male named Ernie Walden and a female named Christy Geiger.  Potter acknowledged that, as he was kicking Harris's hand away from the gun in Harris's waistband, Walden said, "No, man, that's mine, I put that on him."  Potter stated that Geiger "started freaking out," was "emotional," and cried.  After the officers arrested Harris, Officer Potter went to speak to Geiger.  Potter stated that Geiger "seemed to be upset" by the situation and was "aware . . . that there was a real possibility that Mr. Harris was going to

2

get shot."

On cross-examination, Officer Potter stated that he later determined that Walden had been operating the motorcycle at the time of the accident and that there had been no crash. Instead, Walden and Harris simply had fallen off the motorcycle, possibly because they were intoxicated. Potter admitted that he did not test for gun residue on either Harris's or Walden's hands.

The government next called Officer Carrion. Carrion also saw the motorcycle laying a few feet away from Harris's position on the ground. Seeing a gun in Harris's waistband, Carrion drew his weapon and pointed it at Harris. Carrion watched as Harris reached for the gun and Officer Potter kicked Harris's hand away. Carrion saw Walden and Geiger at the scene. According to Carrion, Walden "said something about, That's my gun." Geiger, who was crying and "a little hysterical," identified herself as Harris's girlfriend.

The government then introduced an audio recording and transcript of one particular prison phone call, made with Harris's I-PIN number, in which Harris appears to admit that he possessed the firearm. To lay the foundation, the government called Thomas Price, the Jacksonville Department of Corrections' communications coordinator, who was responsible for the inmate phone system. Price testified that prisoners can only use the phones inside the dorms by entering an individually assigned, seven digit I-PIN number. All inmate phone calls are

automatically recorded, and these recordings can be copied but not altered.

Price identified a disk on which he had downloaded a copy of three calls found by searching for Harris's jail identification number, which corresponded with his I-PIN number. The government's audio recording of one particular phone call made with Harris's I-PIN number came from this disk. The inmate making the call identifies himself as "Michael," which is Harris's first name. Price testified that the government's transcript of the call was accurate. Harris objected to the admission of the audio recording and transcript because "the proper predicate ha[d]n't been laid." The district court overruled Harris's objection.

The district court then excused the jury from the courtroom while the recording was discussed further. The court listened to the recording. The government explained that it could not force Harris to identify the recording because of his privilege against self-incrimination and that the other participants in the conversation were biased in Harris's favor. The government analogized the authentication of the automatic phone recording to the authentication of an automatic unmanned surveillance camera. The district court again overruled Harris's objection, finding that the government "ha[d] established a sufficient predicate that it's Mr. Harris on the line here" and that "there's enough indicia of reliability here that allows the transcript to be played, especially with the limiting instruction which I intend to give."

4

Before the jury heard the recording, the district court instructed the jury that the transcript was admitted for the limited purposes of aiding the jury to follow the conversation and identify the speakers. The district court told the jury that "whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine."

In the recording, the person who initiates the collect call identifies himself as "Michael."[1] The pre-recorded voice on the collect call then identifies "Michael" as an inmate in the Duval County Jail. Roughly seven minutes into the call, a male, a female, and "Michael" begin discussing the contents of a police report, suggesting that the report incorrectly states that "Michael" was originally on his stomach. The female then states, "Michael was laying on his back. . . . That's how they seen the fucking gun." "Michael" asks, "[Y]ou didn't hear me tell the police he did put it there?" The female responds, "[Y]ou said, yall [sic] planted that on me, yall [sic] planted that gun on me." The female then states that she "was so fucking scared" and "just st[ood] there screaming please don't shoot him, please don't shoot him." Apparently referring to the gun, "Michael" states, "[T]hat bitch ain't got no bullets, no nothing. I just remember grabbing that motherfucker out of the house." "Michael" then mentions that, when he fell off of the motorcycle, he could not get his leg out from underneath it. He asks if the motorcycle was messed up.

_____

[1]Thereafter, the transcript referred to him as "Michael Harris."

5

On cross-examination, Price admitted that inmates sometimes exchanged or stole I-PIN numbers, but stated that they were told to keep their I-PIN numbers confidential.

The jury found Michael Harris guilty. He was sentenced to 195 months' imprisonment. Harris timely appealed.

## II. DISCUSSION

Harris argues that his conviction should be reversed because neither the recording of the phone call nor the transcript was authenticated properly.

We review a district court's decision to admit evidence for an abuse of discretion. United States v. Cole, 755 F.2d 748, 766 (11th Cir. 1985). The district court's determination of authenticity should not be disturbed unless there is no competent evidence in the record to support it. United States v. Munoz, 16 F.3d 1116, 1120-21 (11th Cir. 1994). Moreover, the district court has "broad discretion in determining whether to allow a recording to be played before the jury." Cole, 755 F.2d at 766 (citing United States v. Biggins, 551 F.2d 64 (5th Cir. 1977)).

Evidence is properly authenticated when there is "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Rule 901 requires only the presentation of "sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be." United States v. Caldwell, 776 F.2d 989, 1001-02 (11th Cir. 1985). "Once that

6

prima facie showing has been made, the evidence should be admitted" and the trier of fact permitted to determine whether the proffered evidence is what it purports to be. Id. at 1002.

Furthermore, this Court held in Biggins that a district court "properly admits a sound recording into evidence only when the party introducing it carries its burden of going forward with foundation evidence demonstrating that the recording as played is an accurate reproduction of relevant sounds previously audited by a witness." 551 F.2d at 66.[2] The proponent bears the burden of establishing: (1) the competency of the operator; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant portions of the recording; and (4) the identification of the relevant speakers. Id. The primary purpose of these requirements is to "ensur[e] the accuracy of the recording." Id. at 67. Therefore, even if one or more of the above-listed requirements has not been satisfied, "[i]f there is independent evidence of the accuracy of the tape recordings admitted at trial, we shall be extremely reluctant to disturb the trial court's decision" to admit the recording. Id.

Here, we conclude the district court did not abuse its discretion in admitting the recording. Harris challenges only that the government failed to prove the fourth Biggins factor because no witness identified the voice on the recording as

_____

[2]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

his.  Although no witness identified the voice as Harris's, the evidence showed that the recording was associated with Harris's jail identification number, which corresponded with the unique I-PIN number assigned to Harris.  Morever, the speaker identified himself as "Michael," which is Harris's first name.  The inmate speaker in the recording also makes reference to the actual facts at the time of the motorcycle accident that were within the Defendant Harris's knowledge, further corroborating that the Defendant is the speaker.  As such, the government met its burden of authentication by providing sufficient evidence to make out a prima facie case that the speaker in the recording is Michael Harris.

For similar reasons, we also cannot say the district court abused its discretion in admitting the transcript of the recording.  Harris claims that the people who prepared the transcript of the recording attributed the dialogue to him without any personal knowledge to justify the attribution.  However, as noted above, the government met its burden of showing that the speaker is Harris.  Moreover, the district court reviewed the accuracy of the transcript and instructed the jury on the limitations of the use of the transcript.

For these reasons, we affirm Harris's conviction.

**AFFIRMED.**