NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0044n.06

Nos. 19-6148/6186/6253/6254/6352

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Jan 25, 2022<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| TONDWIN LEWIS (19-6148); NERNEST | ) | THE WESTERN DISTRICT OF |
| NESBY (19-6186); DAVANTE TURNER | ) | TENNESSEE |
| (19-6253); MARKEASE ALEXANDER | ) | |
| (19-6254); ARIQ RAYFORD (19-6352), | ) | OPINION |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before: ROGERS, STRANCH, and DONALD, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Tondwin Lewis, Nernest Nesby, Davante Turner, Markease Alexander, and Ariq Rayford (Defendants) were members of an organization called the Conservative Vice Lords, and its Memphis-based subgroup, the Concrete Cartel. After a fifteen-day jury trial, they were each convicted of conspiracy under the Racketeer Influenced and Corrupt Organizations Act (RICO) and of various other offenses related to armed robberies and drug trafficking. On appeal, each raises challenges to his conviction and/or sentence. We **AFFIRM** the district court's judgments.

**I. BACKGROUND**

Lewis, Nesby, Turner, Alexander, and Rayford all lived in and around Memphis, Tennessee and were part of the "Conservative Vice Lords" (CVL), a national organization. The

members of the CVL in the Memphis area considered themselves a subgroup within CVL called the "Concrete Cartel." The Defendants contended that the Concrete Cartel promoted the betterment of the members and the community in general. They do not dispute the general hierarchy, method of communication, and customs of the organization. References to the organization herein will include both the CVL and the Concrete Cartel unless otherwise specified.

Members of the Concrete Cartel held various positions with different responsibilities and distinguished themselves based on rank and status. In general, members could increase their rank by acquiring "stars," and could gain special, nationwide notoriety through "Universal Elite" status. Lewis, Nesby, Turner, Alexander, and Rayford were all "ranking members" of the CVL on various levels. Turner held the highest rank and was a five-star "Minister of Command" at the state level and a Universal Elite; Lewis was a three-star Universal Elite at the city-level; Alexander was a three-star "Chief of Security" at the city level and a Universal Elite; Rayford was a three-star Chief of Security at the city level; and Nesby was a three-star Chief of Security at the local level.

Members of the Concrete Cartel are expected to learn and abide by an established set of rules. They attend weekly meetings, are restricted from eating certain foods, communicate via a complex system of numbers and codes, act secretly, have various greetings, and have special handshakes and oaths. When a member breaks a rule, he or she is punished.

The Government contends, and various former members of the group testified at trial, that the overarching purpose of the Concrete Cartel is "to earn money for its members, principally through drug trafficking and robberies." To show this purpose, the Government called former members who testified that members routinely robbed pharmacies and then sold the stolen prescription drugs for profits. In addition, the record showed that members who stole drugs were

expected to sell drugs to other members at a discounted price, allowing those members to share in the profits from the robberies.

### A. Indictment and Offenses

On May 31, 2018, Lewis, Nesby, Turner, Alexander, and Rayford were each indicted on one count of Racketeering Conspiracy and additional counts related to their participation in armed robberies and drug trafficking. As to the armed robberies and drug trafficking charges, various counts were brought against Defendants related to seven robberies, which occurred on the following dates: June 18, 2015 (Counts 2–6 against Turner); February 15, 2016 (Counts 7–9 against Rayford); April 30, 2016 (Counts 10–13 against Nesby); May 1, 2016 (Counts 14–18 against Nesby); July 22, 2016 (Counts 19–23 against Alexander); November 1, 2016 (Counts 24–31 against Alexander, Turner, and Lewis); and July 5, 2017 (Counts 32–34 against Turner and Lewis). Defendants pleaded not guilty to all counts brought against them.

On July 13, 2018, and on June 3, 2019, the Government moved to dismiss Counts 24–31 against Lewis and Turner, respectively. The district court granted those motions on July 17, 2018, and June 3, 2019.

### B. Jury Trial and Sentencing

On June 3, 2019, a jury trial began, which spanned fifteen days. All five co-Defendants were tried in tandem. On June 24, 2019, the jury returned its verdict finding Lewis, Turner, Nesby, Alexander, and Rayford guilty on all counts charged, except for Counts 2–6 against Turner. Thereafter, they were each individually sentenced to various terms of incarceration.

## II. ANALYSIS

On appeal, Lewis, Nesby, Turner, Alexander, and Rayford raise challenges to: the sufficiency of evidence as to the RICO conspiracy convictions and their robbery convictions;

constitutional and evidentiary errors regarding the trial; and, their individual convictions and sentences. We address these matters in turn.

### A. Sufficiency of the Evidence Challenges to Jury Verdict

Lewis, Turner, Nesby, Alexander, and Rayford all raise sufficiency of the evidence challenges to their RICO conspiracy convictions. Alexander and Turner separately raise challenges related to the robberies in which they were implicated.[1]

### 1. Standard of Review

The standard of review for sufficiency of evidence challenges varies depending on whether a defendant's argument was properly preserved before the district court. *See, e.g.*, *United States v. Kuehne*, 547 F.3d 667, 696–97 (6th Cir. 2008). Where a claim was properly preserved—the defendant made a motion pursuant to Federal Rule of Criminal Procedure 29 (Rule 29 motion) both at the end of the prosecution's case-in-chief and at the close of evidence—the sufficiency of evidence claim is reviewed de novo. Under the de novo standard, the evidence is viewed in the light most favorable to the jury's verdict and the critical question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). A defendant bears a heavy burden and circumstantial evidence alone, if substantial and competent, may sustain a conviction. *See United States v. Tarwater*, 308 F.3d 494, 504 (6th Cir. 2002) (citing *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir.

---

[1] In his briefing, Lewis also raises a sufficiency of the evidence challenge to his Hobbs Act Robbery conviction, contending that he was "incapable of forming the intent to commit the crime" because he was intoxicated. At oral argument, held on October 26, 2021, counsel for Lewis confirmed that the issue was being waived. Accordingly, the court will not reach the merits of that issue.

2002)). Because Turner and Nesby properly renewed their motions at the close of all evidence, their sufficiency of the evidence claims are reviewed de novo.

Not all of the Defendants renewed their Rule 29 motion at the close of evidence. Where a defendant fails to renew his or her Rule 29 motion after the close of evidence, that defendant's sufficiency of evidence challenges are reviewed under a "manifest miscarriage of justice" standard. *See Kuehne*, 547 F.3d at 697. Under this standard, a conviction is reversed only "if the record is 'devoid of evidence pointing to guilt.'" *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002) (quoting *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998)). Alexander and Rayford initially raised "general" motions under Rule 29. And Lewis raised specific grounds for his Rule 29 motion pertaining to his RICO conspiracy conviction.[2] But they did not renew their motions after the close of evidence. Thus, the manifest miscarriage of justice standard applies to Lewis's, Alexander's, and Rayford's sufficiency of the evidence challenges.

### 2. RICO Conspiracy

A defendant violates RICO if he "conduct[s] or participate[s], directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity," or conspires to do so. 18 U.S.C. § 1962(c)–(d). Defendants are charged with a RICO conspiracy, and thus, the Government must "prove four elements: agreement, to conduct or participate, in an enterprise, through a pattern of racketeering activity." *United States v. Gills*, 702 F. App'x 367, 373 (6th Cir. 2017) (citing *Salinas v. United States*, 522 U.S. 52, 62–63 (1997)).

---

[2] Lewis raised specific grounds for his Rule 29 motion, all of which pertained to his RICO conspiracy conviction. Ordinarily, this waives all grounds not specified. *United States v. Porter*, 886 F.3d 562, 556 (6th Cir. 2018). However, the only remaining challenges he raises involve the RICO conspiracy conviction, which have not been waived and are therefore subject to review.

Lewis, Turner, Nesby, Alexander, and Rayford raise various attacks on the sufficiency of evidence that supports their RICO conspiracy convictions. Because Turner and Nesby, whose sufficiency of the evidence claims are reviewed de novo, raise some of the same arguments as Lewis, Alexander, and Rayford, we review those overlapping claims de novo, noting that a failure to surmount this standard of review also constitutes a failure to show a manifest miscarriage of justice.

### a. Enterprise

Lewis, Alexander, Rayford, and Nesby contend that the Government provided insufficient evidence to establish the existence of an "enterprise."

A RICO enterprise includes "any union or group of individuals associated in fact." 18 U.S.C. § 1961(4). This definition is broad in scope. A group qualifies under the statute if it has "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Even informal organizations may meet the statutory definition: groups need not possess a "hierarchical structure or a chain of command"; "decisions may be made on an ad hoc basis and by any number of methods"; members "need not have fixed roles"; and "[t]he group need not even have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.* at 948.

In this case, multiple prosecution witnesses testified that the Concrete Cartel is an existing enterprise under *Boyle*. According to one former member, Clemeko Starks, the purpose of the group was to facilitate making profits by robberies and drug sales. Another former member, Darnell Jordan, joined for protection to increase profits and better notoriety in the Memphis community. Former members further testified that the members of the group advanced its purpose

by robbing pharmacies and then selling the drugs to others for profit or to members at a discount. The members of the enterprise "protected" each other by providing access to guns, delivering additional support to execute successful robberies through the enterprise's network of affiliated people, and affording protection from people who robbed drug dealers. Finally, there was a clear relationship among the members of the group through the various meetings and customs which the membership followed for a period of several years. This evidence was sufficient to allow a rational jury to conclude that the Concrete Cartel was a RICO enterprise within the definition of *Boyle*. 556 U.S. at 946.

Defendants have several responses. They argue that the organization was benign because it did not explicitly sanction crimes at its meetings and as a result, any crimes were sanctioned on an individual level—often on the spur of the moment—not by the Concrete Cartel organization. They contend that none of the profits or stolen drugs went directly to the organization's membership but that they were distributed among those who committed the robbery. While Defendants provide alternative, benign explanations to make sense of the circumstances, several witnesses testified that they joined the group for the explicit purpose of advancing their drug sale profits. Concrete Cartel members supported each other, shared weapons with each other, stole drugs together, and redistributed the stolen drugs together for the benefit of the individual constituents of the group. This coordination shows that the Concrete Cartel was a RICO enterprise, regardless of whether the robberies occurred on an ad hoc basis by some members or whether the perpetrators of the robberies shared the profits with the centralized, named organizations. *See, e.g.*, *Gills*, 702 F. App'x at 374; *United States v. Kamahele*, 748 F.3d 984, 1004 (10th Cir. 2014). It follows that there was sufficient proof for a reasonable jury to conclude (as the jury did here) that the organization constituted a RICO enterprise.

Rayford, whose claim is reviewed under the manifest miscarriage of justice standard, separately argues that because the Government failed to prove every attribute alleged in the indictment regarding the group's structure and activities, it failed to prove a RICO enterprise. But even assuming Rayford is correct that certain allegations of the indictment were not fully proven, "[a] part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored.'" *United States v. Weinstock*, 153 F.3d 272, 279 (6th Cir. 1998) (quoting *United States v. Miller*, 471 U.S. 130, 136 (1985)). Rayford has offered no explanation as to how any variances between the Government's conspiracy indictment and the evidence adduced at trial—which ultimately led the jury to convict Defendants on the RICO conspiracy charge—*materially* differed. *See United States v. Martinez*, 981 F.2d 867, 872 (6th Cir. 1992) ("A variance occurs when the evidence offered at trial differs materially from the charge in the indictment."). In any case, Rayford was indicted for a RICO conspiracy, the jury heard evidence from several prior members of the organization regarding its purpose, internal relationships, and longevity, and the jury ultimately concluded that the elements of the conspiracy—including whether an enterprise within the meaning of a RICO conspiracy existed—were proven beyond a reasonable doubt. Thus, the evidence presented at trial led the jury to reach the very conclusion charged in the indictment: that the Concrete Cartel satisfied the definition of a RICO enterprise.

Rayford fails to carry his burden to demonstrate that the record was devoid of any evidence that would allow the jury to conclude that the Concrete Cartel was a RICO enterprise.

### b. *Pattern of Racketeering*

Lewis and Turner both contend that their RICO conspiracy convictions cannot be sustained because the Government failed to establish a "pattern of racketeering activity." Specifically, they

both assert that they could not be convicted of a RICO conspiracy, where they were involved in only one predicate scheme.

Under a substantive RICO charge, a "pattern of racketeering activity" requires "at least two" predicate acts. 18 U.S.C. § 1961(5). However, "[u]nlike a substantive RICO charge, a RICO *conspiracy* charge does not require proof that the defendant committed *any* predicate acts." *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008) (emphasis added). Rather, it requires only proof that the defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense, [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65. When a defendant does commit predicate acts implicated in a substantive RICO offense, those acts are sufficient proof that he agreed to commit them to sustain a RICO conspiracy conviction. *See United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008).

Lewis and Turner were convicted of several predicate acts. Both were convicted of Hobbs Act robbery (Count 32), brandishing and discharging a firearm in relation to a crime of violence (Count 33), and attempt to knowingly and intentionally possess with the intent to distribute Oxycodone (Count 34). And these acts were connected to the enterprise as they were within the scope of the RICO enterprise charged in the case and furthered that enterprise. Thus, a rational jury could find that Lewis and Turner committed—and thus agreed to commit—sufficient predicate offenses that furthered the criminal endeavor.

Lewis additionally argues that because the counts involving the robbery, brandishing and discharging of a firearm, and attempt to knowingly and intentionally possess Oxycodone with the intent to distribute, all concerned "one robbery," those counts collectively amount to only one predicate act. As noted above, though, one predicate act is sufficient to sustain a RICO conspiracy

conviction, and each offense constitutes a separate predicate act, even though they were related by the single robbery. *See, e.g.*, *Lawson*, 535 F.3d at 444. In *Lawson*, we held that even though the two drug distribution charges were related to the broader charge of conspiracy to distribute controlled substances among the entire enterprise, the three offenses constituted separate predicate acts for RICO purposes. *Id.* "All that is now required for a RICO offense is the commission of two predicate offenses which the state defines as separately chargeable and separately punishable." *United States v. Licavoli*, 725 F.2d 1040, 1053 (6th Cir. 1984) (Merritt, J., concurring).

Both Lewis and Turner were charged with three separate offenses, each of which was separately punishable. Their argument that they were convicted of only one predicate act, therefore, fails as a matter of law. In any case, their convictions for the separate predicate offenses support the jury's conclusion that Turner and Lewis engaged in a pattern of racketeering activity that supports a RICO conspiracy conviction.

### c. Connection Between Predicate Acts and RICO Enterprise

Nesby, Rayford, and Turner next contend that there is insufficient proof that their racketeering acts were connected to the illegal enterprise. In so contending, they take issue with the relationship prong of the "relationship plus continuity" test employed under the RICO statute. *See United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000) (quoting *Sedima v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)).

Under the relationship prong, "[t]he business of a criminal enterprise is crime [and its] crimes form a pattern defined by the purposes of the enterprise." *Id.* (quoting *United States v. Masters*, 924 F.2d 1362, 1366 (7th Cir. 1991)) (alterations in original). By this definition, predicate acts can be linked to the enterprise by evidence that "(1) the defendant was enabled to commit the offense solely by virtue of his position in the enterprise; *or* (2) the offense was related

to the activities of the enterprise." *Id.* (quoting *United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993)) (emphasis added).

As discussed above, the Concrete Cartel's purpose was to facilitate drug dealing, protect its affiliates, and make higher profits from drug sales. The Government presented evidence that Nesby, Rayford, and Turner robbed various pharmacies and stores for drugs in the presence of others affiliated with the Concrete Cartel. Former members of the Concrete Cartel testified that the members would routinely rob pharmacies and redistribute the proceeds from the robberies among themselves or other affiliated members. From this evidence, a rational jury could reasonably infer that Nesby, Rayford, and Turner's robberies and drug trafficking activities were an extension of the Concrete Cartel's activities. Thus, Nesby, Rayford, and Turner fail to satisfy their burden to show that any rational trier of fact would not have found a connection between their acts and the RICO enterprise. *See Fisher*, 648 F.3d at 450.

### 3. Robbery-Related Convictions

Alexander and Turner each challenge the sufficiency of the evidence concerning the convictions which resulted from their robberies.

#### a. July 22, 2016, Robbery (Alexander)

Alexander's convictions were for a robbery on July 22, 2016, during which he and his accomplices entered a CVS pharmacy wearing masks and ordered everyone to get down. One of the men located the pharmacist, forced the pharmacist to turn over the pharmacy's opioids, and then left with over 5,000 pills, worth more than $32,000. Alexander was not apprehended directly following the robbery.

At trial, the Government sought to prove Alexander's involvement in the crime through several pieces of circumstantial evidence. First, the Government provided cell phone location data

showing that Alexander's cell phone traveled to the CVS, was present at the time of the robbery, and then traveled away from the area afterward. Second, the Government provided evidence from a security camera of a resident who lived across the street from the CVS showing that Alexander's car was near CVS at the time of the robbery. Jodeci Hill, a prosecution witness and Alexander's longtime girlfriend, identified that car as Alexander's car. Third, a CVS employee who fled the robbery testified that he noticed that one of the robbers was wearing a unique pair of sneakers. When shown a picture of the shoes that Alexander wore, the CVS employee identified them as being nearly identical to the shoes he saw at the robbery. Fourth, Hill testified that Alexander told her that he committed the robbery on July 22, 2016. And finally, a fellow member of the Concrete Cartel and prosecution witness, LaShawn Shannon, testified that Alexander was in possession of the pills after the July 2016 robbery, and that when Alexander referred to a "pill situation" during a jail-cell call, he understood that Alexander was referring to the July 2016 robbery.

Alexander claims that the evidence at trial discussed above was insufficient to establish that he was one of the perpetrators of the robbery. In support of his claim, he makes three factual points. First, Hill testified at trial that the only pills Alexander had after the robbery were Xanax, a type of pill that was not stolen in the July 2016 robbery. Second, the shoes identified are "hardly a unique sighting akin to a unicorn in American society." And finally, Hill's memory was not clear and thus "it is entirely plausible that Ms. Hill was confused as to 'which' robbery he was discussing."

As noted, because Alexander did not renew his Rule 29 motion at the close of all evidence, his claim is reviewed for manifest miscarriage of justice, *i.e.*, whether the record is devoid of any evidence pointing to his guilt. Even excluding the evidence with which Alexander takes issue, the record on the whole contains other inculpatory evidence—including that his car and cell phone

were present at that CVS at the time of the robbery—sufficient to allow the jury to conclude that Alexander was one of the perpetrators of the July 2016 robbery. In short, the record was not devoid of any evidence that would allow the jury to conclude that Alexander was a perpetrator in the robbery. That Alexander can point to other, plausible explanations regarding some of the evidence does not satisfy his burden. *See, e.g.*, *United States v. Romero*, 57 F.3d 565, 570 (7th Cir. 1995) ("Alternative explanations alone, even if plausible, do not ordinarily overcome the defendant's burden in challenging the sufficiency of the evidence.").

### b. July 5, 2017, Robbery (Turner)

Turner was convicted of a robbery which occurred on July 5, 2017 (Counts 32–34). At that robbery, three men—Turner, Lewis, and another Concrete Cartel member, William Pinkney— entered a CVS wearing masks and armed. A pharmacist in the store was able to call 911, but one of the three men found the pharmacist and fired a shot as he ordered him to the pharmacy. The men ultimately fled after hearing the sirens.

The police officer who responded to the scene saw Lewis running across the parking lot next to the CVS and apprehended him. He was wearing latex gloves and was in possession of a gun. Thereafter, Lewis began vomiting in the officer's car and he was taken to the hospital for medical treatment. Subsequently, another officer saw two men run across the street from the CVS. He and several other officers searched the area and found Turner and Pinkney hiding in a large commercial dumpster. When questioned regarding what they were doing there, Pinkney told the officer "he live[d] there."

At the place where Pinkney and Turner were apprehended, police found latex gloves and a gun. And nearby, the police officers found a red sweatshirt, which the surveillance video showed matched the sweatshirt worn by one of the robbers. The video showed that the masked robber in

the red sweatshirt also wore gray sweatpants and blue sneakers—both of which Turner wore when he was apprehended. In addition, the clothing worn by the second robber in the video—black pants, black Nike sneakers, and a black coat—matched the clothing worn by Pinkney at the time of his arrest.

Turner contends that this evidence was insufficient to support his convictions because there was no direct testimony identifying him as a perpetrator in the robbery; he was not found in possession of any stolen items, narcotics, or firearms; and he did not confess to any involvement in the robbery. Turner argues that "mere proximity [is] insufficient to establish that a defendant aided and abetted in the commission of a criminal offense."

Here, however, evidence beyond mere proximity to the robbery exists. Indeed, the arresting officer testified that the clothing which Turner and Pinkney wore when they were arrested matched the clothing worn by the two robbers in the video. Photographs were also submitted for the jurors to draw their own independent conclusions. And Turner omits the fact that when he was apprehended by the police, latex gloves and a gun were also found in the dumpster area. Turner provides no analysis to explain why this evidence would be insufficient for a jury to conclude that he was a perpetrator of the robbery. The jury is entitled to "tak[e] into account 'their own wisdom, experience, and common sense' when evaluating the evidence admitted at trial." *Thompson v. Parker*, 867 F.3d 641, 648 (6th Cir. 2017) (quoting *Doan v. Brigano*, 237 F.3d 722, 734 (6th Cir. 2001)). Based on the evidence and construing it in the light most favorable to the jury verdict, a rational jury could find, as this jury did, that Turner was one of the perpetrators of this robbery.

### B. Constitutional Challenges

Turner and Rayford raise one constitutional challenge. Both contend that their Sixth Amendment right to a public trial was violated by the exclusion of two spectators from the trial for approximately twenty minutes.

The facts regarding this issue are not disputed by the parties. On June 6, 2019, Defendant Turner's girlfriend, Jerrica Tyson, was present for the trial with a female companion. During trial, Deputy U.S. Marshal Cook observed Tyson and her friend speaking loudly and distracting jurors. Consequently, he made eye contact with them to indicate that they stop speaking loudly.

The next day, Tyson and her friend were present again. Throughout the day, Deputy Marshal Cook observed them speaking loudly, at which point he asked them both to come out in the hallway. He told them to stop speaking during the proceedings and then allowed them to re-enter the courtroom. When they re-entered the courtroom, the Government was engaged in the direct examination of one of its witnesses. This time, a case agent for the Government, Officer Scott Edwards, recognized Ms. Tyson and noticed that she was holding a notepad with the word "snitch" written on it and the names "Issue Cooks" and "Michael Taylor." Officer Edwards became suspicious that Tyson could be attempting to intimidate a witness and requested that she follow him out of the courtroom to the hallway. When Turner realized that she had left the courtroom, he directed Tyson's companion to find out what had happened. Deputy Marshal Cook then followed the companion outside, at which point Cook told her and her friend that they could not attend the trial for the rest of the day. At that time, Officer Edwards also seized Tyson's notebook, took a picture of her driver's license, and told her to leave the trial. About twenty minutes later, the Government's witness completed his direct examination, and the court recessed for lunch.

During lunch, the court was informed of the incident. The district judge stated that he "didn't know anything like that was going on" and was "very concerned about it." The court gave defense counsel an opportunity to contact Tyson and her friend and ask them to return, which defense counsel declined to do. After the jury was dismissed for the day, Turner's counsel moved for a mistrial.

The following morning, the court decided that it needed a hearing to develop the issue on the record. Following the receipt of testimony and evidence on the record, the court concluded that there had been no courtroom closure that implicated the Sixth Amendment and therefore denied Turner's motion for a mistrial. The court stated that it "did not take an affirmative step to prevent anyone from entering into the court." The court reiterated that Tyson and her companion were only excluded for about 20 minutes, after which it "gave the defense an opportunity to call and have them come back" but "they declined." The court also ruled that even if the exclusion constituted a partial courtroom closure under the Sixth Amendment, it was permissible because preserving court decorum and addressing potential threats to witnesses provided a substantial reason to ask the spectators to leave. It noted that the response was sufficiently tailored to the circumstances.

In considering whether a courtroom closing violated the Sixth Amendment, questions of law are reviewed de novo and questions of fact are reviewed for clear error. *United States v. Simmons*, 797 F.3d 409, 412 (6th Cir. 2015).

In general, depriving a defendant of his or her Sixth Amendment right to a public trial is a "structural defect affecting the framework within which the trial proceeds" that requires reversal regardless of whether the defendant demonstrates that the error prejudiced some substantive right. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). But "[i]t does not necessarily follow . . .

that every deprivation in a category considered to be 'structural' constitutes a violation of the Constitution or requires reversal of the conviction, no matter how brief the deprivation or how trivial the proceedings that occurred during the period of deprivation." *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009). Indeed, "courts have consistently refused to find Sixth Amendment violations when a courtroom closure is so limited." *United States v. Arellano-Garcia*, 503 F. App'x 300, 305 (6th Cir. 2012) (citing *Gibbons*, 555 F.3d at 121; *United States v. Perry*, 479 F.3d 885, 890–91 (D.C. Cir. 2007); *United States v. Al-Smadi*, 15 F.3d 153, 154–55 (10th Cir. 1994); *United States v. Sherlock*, 962 F.2d 1349, 1357–58 (9th Cir. 1989)). In such cases, a defendant's Sixth Amendment right hinges on whether the asserted closure contravenes the values advanced by the public trial guarantee, "which include (1) ensuring a fair trial; (2) reminding the government and the judge 'of their responsibility to the accused and the importance of their functions'; (3) encouraging witnesses to come forward; and (4) discouraging perjury." *United States v. Greene*, 431 F. App'x 191, 195 (3d Cir. 2011) (quoting *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996)).

In *Greene*, the Third Circuit dealt with a "closing" similar to this one. There, a court security officer—unbeknownst to the court—temporarily excluded the defendant's brother from the courtroom. *Id.* at 193–94. In concluding that the closing was sufficiently limited that it did not implicate the Sixth Amendment, the Third Circuit focused on the facts that the partial closure occurred unbeknownst to the district judge; the closure was limited in scope and therefore unlikely to jeopardize the aims served by the Sixth Amendment; and the closure was not subsequently ratified by any affirmative act of the court. *Id.* at 196–97. Here, too, the partial closure occurred without the district judge's knowledge—in fact, the district judge was not notified until after the two spectators had already been excluded. At that point, the district judge instructed the defense

counsel to notify Tyson and her companion that they could return to the courtroom, which defense counsel ultimately declined to do. In addition, the district judge specifically admonished the Government for its actions, indicating that it was not ratifying that action. Although the Government's actions in this circumstance are troubling, based on the entire record, we cannot say that the incident implicated Defendants' Sixth Amendment rights because the incident did not undermine the values advanced by the public trial guarantee.

**C. Evidentiary Challenges**

Turner and Nesby both raise several evidentiary challenges, which they contend warrant reversal of their convictions. We address the challenges in turn.

1. Standard of Review

In general, evidentiary rulings are reviewed for abuse of discretion. *See United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009). However, a district court's ultimate legal conclusion as to admissibility is reviewed de novo. *United States v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir. 1998). Any evidentiary error is also subject to harmless error analysis. *See United States v. Kettles*, 970 F.3d 637, 643–45 (6th Cir. 2020).

2. Turner's Challenges

Turner raises four evidentiary challenges. First, he contends that the district court abused its discretion by admitting a post-arrest jail call between Lewis and an unidentified individual to whom Lewis made admissions about the July 5, 2017, robbery and mentioned Turner's involvement by referring to his nickname, "Star." At trial, Lewis invoked his Fifth Amendment right not to testify and therefore was unavailable under the Federal Rules of Evidence. Turner objected, arguing that the jail-cell records were inadmissible against him and that the admission violated the Confrontation Clause of the Sixth Amendment. The Government maintained that the

statements were admissible against Lewis as admissions of a party opponent under Federal Rule of Evidence 801(d)(2)(3) and admissible against Turner as statements against penal interest under Federal Rule of Evidence 804(b)(3), and also requested a limiting instruction stating that the evidence could be used only against Lewis, not Turner. The district court agreed to the limiting instruction, telling the jury to disregard any reference to Turner in the records and that the records should not be used for any purpose other than to determine Lewis's guilt.

Turner continued to maintain that the records were inadmissible against him, but retracted his Sixth Amendment argument, asserting instead that the statement was inadmissible under the Federal Rules of Evidence and should result in a mistrial because the curative instruction was inadequate. The district court disagreed, concluding that the limiting instruction was an adequate curative measure. When the jury later retired to deliberate, the court again reiterated its instruction that the jail call between Lewis and the unidentified individual could only be used "in deciding whether the government proved [Lewis] guilty" and the jury could not "consider it in any way against any of the other defendants."

On appeal, Turner maintains that the district court erred when it allowed hearsay to be admitted under the "co-conspirator" exception. Turner also argues that the admission of the statements was not harmless, but cites caselaw under the Confrontation Clause, because the jury instruction was inadequate to limit the jury's use of such an incriminating statement. The Government responds that the court did not abuse its discretion because the judge issued a limiting instruction to the jury, the statements could have been admitted against Turner as a statement against penal interest by Lewis under Federal Rule of Evidence 804(b)(3), and the admission constituted harmless error.

Regarding prejudice, the district court issued limiting instructions to the jury on two occasions to limit the jury's consideration of the calls as to Lewis only, and not Turner. Juries are generally presumed to follow their instructions. *See United States v. Johnson*, 803 F.3d 279, 282 (6th Cir. 2015). The district court therefore did what the Federal Rules of Evidence require: it "restrict[ed] the evidence to its proper scope and instruct[ed] the jury accordingly." Fed. R. Evid. 105.

As to harmless error, moreover, despite Turner's concerns about the effectiveness of the jury instructions, the other evidence that Turner committed the July 2017 robbery was substantial—and a sufficient basis for a reasonable jury to conclude that Turner was implicated in the robbery. The record includes the following. Turner was apprehended near a dumpster near the CVS following the robbery. He was wearing grey sweatpants and blue sneakers, and a red sweatshirt was located near the dumpster—all of which matched one of the perpetrators shown by the security camera. A gun and latex gloves were also found in the dumpster area. And finally, the clothes that Pinkney—who was also apprehended in the dumpster area with Turner—matched the clothes that were worn by the other perpetrator in the security camera. In short, these facts would permit a reasonable jury to conclude that Turner was a perpetrator in the July 2017 robbery. Thus, the admission of the jail calls against Lewis did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 775 (1946)).

Turner's reliance on *Bruton v. United States*, 391 U.S. 123, 135–36 (1968), a case involving the Confrontation Clause, in his harmless error analysis is misplaced. There, the Supreme Court found that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant,

that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. This concern is particularly salient in testimonial situations, "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross-examination." *Id.* at 135–36. But as the district court concluded, and as Turner's counsel conceded, the Sixth Amendment is not implicated in this case because it does not involve testimony. Thus, because the Sixth Amendment is not implicated, those concerns do not apply with the same force here. And Turner points to no other error constituting prejudice in admitting the statements against Lewis. For these reasons, and in reviewing the entire record, it is clear "that the judgment was not substantially swayed by the error." *United States v. Warman*, 578 F.3d 320, 340 (6th Cir. 2009) (quoting *Kotteakos*, 328 U.S. at 765).

Second, Turner challenges the district court's admission of Lewis's post-arrest statements. At trial, during its direct examination of an arresting officer, the Government elicited the following testimony regarding Lewis's statements at the time of his arrest:

Q. And did the person say anything to you?

A. Once the arrest was made?

Q. Yes.

A. He said a few words as far as being arrested or he don't have anything on him at the time.

Q. Did he say anything else to you specifically about if you were somebody else?

A. Oh, yes. Once we was in the hospital and my bodycam at this time, it was going out, made a statement if I was a white person he probably would have killed me.

> Q.    A white person or white cop?
>
> A.    A white cop.

(R. 669, PageID 4939–40)

Following this exchange, Turner's counsel—not Lewis's counsel—objected to the statement—"if I was a white person, he probably would have killed me"—contending that such a statement was not relevant under Federal Rule of Evidence 401. The district court concluded that it was "marginally" relevant as a statement of a party opponent that was made at the time he was arrested. On appeal, Turner contends that because "the Government is seeking to prove a robbery and, more broadly, a racketeering conspiracy, the officer's testimony as to a co-defendant's potential racial prejudice or animus towards police officers is wholly unrelated, irrelevant, and in fact highly inflammatory, such that the admission of said testimony by the district court was an abuse of discretion." Turner's argument focuses on the prejudicial effect of the entry of that statement, which implicates Fed. R. Evid. 403.

In general, a district court's determination of relevance under Fed. R. Evid. 403 is given substantial deference, and a district court's "decision will not be disturbed if substantial injustice did not result." *United States v. Cleveland*, 907 F.3d 423, 436 (6th Cir. 2018) (quoting *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 832 (6th Cir. 2000)).

Setting aside whether the statement was relevant under Fed. R. Evid. 401, and the analysis of the probative value of the evidence, Turner has not pointed to any substantial injustice that resulted from its inclusion on the record that would warrant exclusion under Federal Rule of Evidence 403 or demonstrate that the admission of the statement did not constitute harmless error. While he points out "the lack of diversity among the venire" and significant concerns of racial prejudice and bias, all of which are well taken, he does not explain how the admission of this

testimony alone led the jury to convict him on impermissible grounds. The testimony does not nullify the other evidence that the Government presented against him, based on which the jury was reasonably allowed to draw its own conclusions as to Turner's guilt. Because Turner points to no substantial injustice resulting from the admission of this statement, the district court did not err in permitting the testimony.

Third, Turner contends that the district court "erred in allowing testimony related to the jail fight that occurred between a cooperating witness and two co-defendants because there was improper notice of the Government's intent to introduce said evidence which resulted in severe prejudice to Turner's defense." In so arguing, Turner relies on Federal Rule of Criminal Procedure 16, *Brady v. Maryland*, 373 U.S. 83 (1963), and Federal Rule of Evidence 403.

By way of background, shortly before trial, the Government learned that Turner and Nesby had "physically attacked" McCalleum, a cooperating witness, in prison and called him a "snitch." On the same day, the Government informed Turner and Nesby's counsel of the discovery and directed the U.S. Marshal to investigate. On June 4, 2019, the Government received an e-mail from the prison, which the Government disclosed to defense counsel, stating that the incident had occurred and was captured on video. Thereafter, the Government learned that the prison was no longer in possession of the video because videos are only retained for 90 days, and the incident had occurred in February 2019. Turner sought to exclude evidence about the incident on the grounds that he had received inadequate notice. The district court denied the motion, concluding that the Government acted in good faith, with reasonable diligence, and that Defendants themselves were present and involved in the incident and could testify about it.

We address in turn each argument raised by Turner regarding the jail fight. Federal Rule of Criminal Procedure 16 requires the Government to disclose documents if they are "within the

government's possession, custody, or control" and material to a defendant's defense, intended for presentation during the government's case-in-chief, or obtained from or belonging to defendant." Fed. R. Crim. P. 16(a)(1)(E). Alleged violations under Federal Rule of Criminal Procedure 16 are reviewed by considering: "(1) the reasons for any delay in producing materials, including ill intent or bad faith; (2) the degree of prejudice, if any to the defendant; and (3) whether any prejudice may be cured with a less severe course of action like a continuance or a recess." *United States v. Robinson*, 272 F. App'x 421, 433 (6th Cir. 2007). "[S]uppression of evidence must be viewed as an undesirable remedy reserved for cases of incurable prejudice or bad faith conduct demanding punishment by the court." *United States v. Maples*, 60 F.3d 244, 247 (6th Cir. 1995).

There is no dispute among the parties that the Government did not act in bad faith. While Turner argues that the failure to disclose led to "incurable prejudice," it appears, as the district court concluded, that these concerns could have been addressed by rebuttal evidence. The individuals implicated in the fight were co-Defendants at trial, and Turner could have testified regarding his own knowledge of what transpired. Turner provides no response as to why his own testimony would have been insufficient to rebut the testimonial evidence that the district court permitted. Accordingly, the record does not show error under Federal Rule of Criminal Procedure 16.

Next, Turner relies on *Brady v. Maryland*, 373 U.S. 83 (1963), asserting that "the Government had a duty to timely provide defendants with exculpatory evidence." True, but here the evidence—that Turner and Nesby attacked a cooperating witness because he divulged confidential and incriminating information—does not aid in proving Turner's innocence. To the contrary, it points to his participation in the enterprise and the inner workings of that enterprise. In other words, the evidence here is inculpatory, not exculpatory, and thus *Brady* is inapposite.

Finally, Turner relies on Federal Rule of Evidence 403 to contend that the probative value of the testimony was outweighed by the fact that other "testimony to that same effect had already been produced for the jury's consideration." Turner concedes that the evidence here contains some probative value, particularly regarding his participation in the enterprise and the inner workings of that enterprise. Further, he does not provide any analysis as to why entry of this testimony was so prejudicial, even if other testimony on the record had been produced on the point, as to outweigh that probative value. Accordingly, the district court did not abuse its broad discretion in permitting the testimony under Rule 403. *See United States v. Paulsen*, 655 F.3d 492, 509 (6th Cir. 2011) (describing the district court's broad discretion under Rule 403).

The fourth and last evidentiary challenge by Turner is his assertion that the district court "erroneously admitted jail calls into evidence because the Government failed to establish an evidentiary foundation and failed to properly authenticate the jail calls."

At trial, the Government introduced recordings of jail calls through Officer Ruben Ramirez, the investigator at the Shelby County Sheriff's Office, who was assigned to monitor detainee phone calls. Officer Ramirez explained that each detainee is assigned a unique "RNI number" which each detainee is required to enter when making a phone call. To identify calls by a specific detainee, he uses the detainee's RNI number, and information from other databases, such as arrest histories, emergency contacts, and frequently dialed numbers. In addition, detainees are instructed to state their names at the beginning of calls, but sometimes they use nicknames or street names. At trial, Officer Ramirez testified that he identified phone calls from Turner using Turner's RNI number and the fact that the caller identified himself as "Star." Several witnesses at trial testified that "Star" was Turner's nickname.

Turner objected to the admission of the calls, contending that they lacked foundation identifying him as the caller. The district court denied the objection, concluding that the use of Turner's RNI number to identify the calls and the use of the caller identification as "Star" was sufficient foundation.

Turner now contends that the use of the nickname "Star" is not enough to authenticate the call under Federal Rule of Evidence 901. He argues that the nickname "is not a form of reliable self-identification because there are countless individuals who could likely go by the same nickname." And "Turner's voice was never identified by an individual who knew his voice [so] . . . it is possible that another inmate could have used Turner's PIN number to make phone calls in question or rather use [*sic*] an alias associated with someone else in order to avoid the detection by authorities."

Federal Rule of Evidence 901(a) states that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." The rule demands only enough proof to allow that "a reasonable juror could find in favor of authenticity or identification," and "[t]he rest is up to the jury." *United States v. Jones*, 107 F.3d 1147, 1150 n.1 (6th Cir. 1997) (quoting 5 JACK B. WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE ¶ 901(a)[01], 901–19 (1996)). Other circuits have held that self-identification on a call, alone, is not sufficient to authenticate the caller's identity. *See United States v. Khan*, 53 F.3d 507, 516 (2d Cir. 1995); *United States v. Pool*, 660 F.2d 547, 560 (5th Cir. Unit B 1981).

Turner has provided no reason to conclude that the combination of circumstances—the use of Turner's RNI number to make the call and the statement of his nickname at the beginning of the call—was insufficient to provide the jury with reasonable facts from which to draw a conclusion. And in a similar case, the Eleventh Circuit found that the combination of the caller's

self-identification and the detainee's unique identification number was sufficient to authenticate the call. *See United States v. Harris*, 338 F. App'x 892, 895 (11th Cir. 2009) (per curiam). On this record, the district court did not abuse its discretion in admitting the calls into evidence.

### 3. Nesby's Challenges

Nesby raises one evidentiary challenge. He contends that the district court impermissibly allowed "other-acts evidence" under Fed. R. Evid. 404(b). Specifically, he argues that the Government improperly introduced evidence of: (1) robberies committed by other Defendants (not Nesby); (2) Nesby and Turner's altercation with McCalleum in prison; and (3) Rayford's participation in two shootings.

Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion that person acted in accordance with the character." The district court rejected Nesby's assertion because "the evidence was direct proof of the criminal charges against defendants."

 "Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a *continuing pattern of illegal activity*." *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995) (emphasis added). As here, a continuing pattern of illegal activity may include a criminal conspiracy, *United States v. Tripp*, 782 F.2d 38, 41 (6th Cir. 1986), or a racketeering enterprise, *United States v. Nicholson*, 716 F. App'x 400, 420 (6th Cir. 2017). Thus, Nesby is mistaken in relying on Rule 404(b) because the Government sought to use evidence of his crime not to prove character, but to establish an ongoing, continuing pattern of illegal activity. *Barnes*, 49 F.3d at 1149.

### D. Conviction and Sentencing Challenges

Alexander raises a challenge regarding his conviction, and Turner raises a challenge regarding his sentence. We address these challenges in turn.

#### 1. Conviction Challenge (Alexander)

Alexander contends that his convictions under 18 U.S.C. § 924(c)—which requires that he knowingly use, carry, brandish and discharge a firearm—must be vacated because Hobbs Act robbery under 18 U.S.C. § 1951(b)(1) is not a "crime of violence" as defined in § 924(c)(3)(A). Relying on *United States v. Davis*, -- U.S. --, 139 S. Ct. 2319 (2019), Alexander contends that "it is unclear whether [he] was convicted under the elements clause of § 924(c)(3)(A) or the residual clause of § 924(c)(3)(B) . . . [and] a conviction under the residual clause is unconstitutionally vague." Based on the statutory definition for "robbery," Alexander also argues, "robbery can be defined in such a way that robbery does not necessarily contain an element the use, attempted use, or threatened use of physical force."

But as Alexander concedes, in *United States v. Gooch*, 850 F.3d 285, 292 (6th Cir. 2017), we specifically held that a conviction under § 1951(b)(1) constitutes "a crime of violence" under § 924(c)(3)(A). And after *Davis* was decided, we held that "*Gooch* remains good law." *United States v. Holmes*, 797 F. App'x 912, 918 (6th Cir. 2019); *see also Porter v. United States*, 959 F.3d 800, 804 (6th Cir. 2020). Because Alexander was convicted under § 924(c)(3) in relation to a crime of violence—Hobbs Act Robbery—that conviction satisfies the elements clause. Accordingly, vacatur is not warranted on these grounds.

#### 2. Sentencing Challenge (Turner)

Turner challenges his sentence on three grounds. First, he contends that using acquitted conduct to determine a sentence violates Turner's Sixth Amendment rights and his Fifth

Amendment right to due process. Second, he contends that the acquitted conduct used to enhance his offense level was not proven by a preponderance of the evidence. Finally, Turner asserts that the acquitted conduct used was not relevant conduct under § 131.3(a)(1) of the Sentencing Guidelines.

Turner was acquitted of the counts associated with the CVS robbery on June 18, 2015. On that day, three men—armed and wearing masks—entered a CVS drugstore around 11 p.m. and ordered everyone down on the floor. One of the men jumped over the counter and handed a piece of paper to the pharmacist containing a list of drugs demanded. The armed man held the pharmacist at gunpoint, ordering her to place the drugs on the list in his bag. Once the pharmacist had done so, and placed money in the bag from the cash register, the men fled. But the men left the paper that listed the drugs at the pharmacy.

Police found another member of the Concrete Cartel, Arterrious Tate, driving in the vicinity. When asked why he was in the area, Tate averred that he was coming from a Taco Bell, but there was a "divided roadway" that blocked the Taco Bell from the area where Tate was stopped, but that explanation made little sense. Later, a forensic examiner recovered Turner's fingerprints from the piece of paper demanding drugs. When police questioned Turner about his fingerprints on the note, Turner responded that he had written on a lot of "notebook paper" even though the police had not revealed that the note was written on notebook paper. At sentencing, the district judge found that these facts established by a preponderance of the evidence that Turner was involved in the June 18, 2015, robbery.

The district judge thereafter found the conduct relevant under USSG § 1B1.3(a)(1) and used the acquitted conduct in determining Turner's sentence to calculate the offense level for Turner's RICO conspiracy pursuant to USSG § 2E1.1(a). The court's ruling resulted in a

combined offense level of 35 for Turner's convictions on Counts 1, 32, and 33, and with a criminal history category of I, yielding an advisory range of 168 to 210 months of imprisonment. Turner's § 924(c) conviction on Count 33 carried a mandatory sentence of 120 months of imprisonment. The court ultimately varied downward from the advisory range and sentenced Turner to 120 months of imprisonment on Counts 1, 32, and 34 (to run concurrently) and a consecutive sentence on Count 33 of 120-months, resulting in 240 months of imprisonment.

The district court's finding of fact at sentencing are reviewed for clear error and its legal conclusions de novo. *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018).

We begin with Turner's constitutional challenge to the use of acquitted conduct. Our binding precedent in *United States v. White*, which held that a district court's consideration of acquitted conduct in sentencing under an advisory guidelines system does not violate the Sixth Amendment, constrains us to conclude that the use of acquitted conduct in sentencing is not a violation under the Constitution. 551 F.3d 381, 383–84 (6th Cir. 2008) (en banc).

As to the substantive merits of the district court's determination, the district court clearly set forth its reasoning for the findings of fact that led it to conclude that a preponderance of the evidence supported Turner's involvement and also explained why that conduct was relevant under the Guidelines. The court relied on the findings that: Turner's fingerprint was found on the note; Turner made a statement regarding notebook paper to the investigator without anyone ever telling him that his fingerprint was on notebook paper; Tate—a fellow Concrete Cartel member—was in the area and driving suspiciously; and Tate turned out to be Turner's "right-hand man." The court concluded that this evidence showed it was "more likely than not" that Turner was involved, or at least "aided, abetted, willfully caused, counseled, commanded [the robbery], or [the robbery was] jointly under[taken] activity that was reasonably foreseeable" to Turner. That Turner now raises

an alternative, and arguably plausible, explanation of the events does not render erroneous the district court's conclusion and weighing of evidence. *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). Based on those facts, we perceive no error in the district court's legal conclusion that a preponderance of the evidence supported Turner's involvement.

Finally, with respect to Turner's challenge to the district court's conclusion that these facts constitute relevant conduct under the Guidelines, USSG § 1B1.3(a)(1) provides two avenues for defining relevant conduct. First, under USSG § 1B1.3(a)(1)(A), "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" is relevant conduct that could be used to enhance a sentence. Second, under USSG § 1B1.3(a)(1)(B), relevant conduct is also defined as conduct "in the case of a jointly undertaken criminal activity . . . , all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity." Critically, as to both subsections, the conduct must have "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." *Id.*

The district court found that the conduct was relevant under both § 1B1.3(a)(1)(A) and § 1B1.3(a)(1)(B), but that either one would be sufficient to sustain the sentence determination. As to Section (A), which Turner does not address, the record evidence supported the district court's conclusion that it was more likely than not that Turner himself was involved in the robbery and that the robbery was relevant conduct related to the RICO conspiracy, given the similarities between this robbery and the other robberies implicated in the RICO conspiracy. Based on this, we therefore find no error in the district court's consideration of the robbery as relevant conduct

under § 1B1.3(a)(1)(A).  Because the district court's findings under § 1B1.3(a)(1)(A) support the sentence, we need not address Turner's argument that his conduct was not relevant under § 1B1.3(a)(1)(B).

## III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgments of the district court in their entireties.